MICHAEL NEAL KLEINBART AND HAZEL
ELIZABETH MULLIN *v.* STATE OF
MARYAND

[No. 243, Initial Term, 1967.]

*Decided October 16, 1967.*

184

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and O'DONNELL, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Frank B. Haskell, III,* for appellant Kleinbart, and *Fred W. Rickerson* for appellant Mullin.

*Dickee M. Howard, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Edward P. Camus, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

Appellants, Hazel Elizabeth Mullin and Michael Neal Kleinbart (also known as Albert Feldman) were charged in a three (3) count Indictment returned by the Grand Jury for Prince George's County with breaking and entering, on May 25, 1966, the dwelling house of Gerald Matthew LeCompte and Reba Veronica Wilson, with grand larceny of their personal property and with receiving stolen goods.

After a non-jury trial on August 11, 1966, presided over by Judge Samuel W. H. Meloy, they were each found guilty of grand larceny and not guilty of receiving stolen goods. It does not appear from the record that the trial judge made any findings on the first count in the Indictment.

From the judgments imposed—five (5) years imprisonment as to Kleinbart and three (3) years imprisonment as to Mullin—they appeal, each contending that they were subjected to unlawful searches and seizures of the automobile in which they were riding at the time of their arrest and that the evidence offered against them was not sufficient to sustain their convictions. Appellant Mullin further contends that her oral statement offered in evidence against her was inadmissible.

(a) *Searches and Seizures*

At about 2:30 p.m. on May 25, 1966, Trooper Blazejak of the Maryland State Police was attracted to most erratic driving by Appellant Mullin, operating a 1960 white Ford Falcon

sedan with Maryland registration; as she proceeded onto Route #5 from the parking lot at the Marlow Heights Shopping Center, she almost struck the curbing on the traffic island in the highway, swerved across the fast-lane of traffic, cutting off several cars which were required to stop suddenly and as she approached the red traffic signal at Colebrook Drive, the brakes were so suddenly applied that her passenger, Kleinbart, was caused to be thrown against the dash.

The Trooper directed her, when the traffic signal changed, to pull onto the median strip. She there identified herself by a driver's license and registration card in the name of Dolores Marie Evans Smallwood (later ascertained to be her sister) of Landover, Maryland. She appeared to the Trooper to be "under the influence" and although she stated to him that she had had "only one beer," in view of her driving and her appearance, he decided to charge her with a violation of Art. 66½, Sec. 206 (Ann. Code, 1967 Repl. Vol.)—a misdemeanor. He crossed Route #5 to phone the State Police Post in Marlboro for assistance and while in the phone booth noticed that Kleinbart, who had been "passed out" on the front seat of the car, was then staggering and meandering across the traffic lanes of the busy highway to a parking lot on its opposite side. Since Kleinbart appeared to the Trooper to be drunk, he was arrested for "public drunkenness" a misdemeanor in violation of Art. 27, Sec. 123 (Ann. Code, 1967 Repl. Vol.).

When the Ford was stopped in the median strip and as Mrs. Mullin began to alight, "a container of pills" was noticed on the front seat. When Mrs. Mullin said they were hers, the Trooper returned them to her. While talking to Mrs. Mullin, Trooper Blazejak noticed a number of articles of clothing apparently thrown on the rear seat of the car, but made no inspection of them and at the time of trial, could not describe them.

In response to his call, Troopers Arnold and Riffee, within about 5 minutes, arrived at the scene; Appellants were transported to the State Police Post by Trooper Arnold and the Ford sedan, and all its contents, was towed within a 15 or 20 minutes interval to Cole's Amoco Station, located at the intersection of Routes #5 and #414, after a tow-truck had been dispatched to the scene upon the request of Trooper Arnold.

At the Police Post, about one hour after her arrest, Appellant Mullin was charged—in her sister's name—with operating a motor vehicle under the influence of narcotics (Art. 66½, Sec. 206, *supra*) and was charged—in her correct name—apparently on the next day, with reckless driving, Art. 66½, Sec. 209 (Ann. Code, 1967 Repl. Vol.). When at the Police Post, it was ascertained that Kleinbart was not under intoxication of alcoholic origin, but apparently of narcotics, he was sent to the Prince George's Hospital by ambulance. After issuing the traffic summons on May 25th, Trooper Blazejak withdrew from the case (except to issue the summons for reckless driving on May 26th) and turned the case over to Corporal Ansell of the Criminal Investigation Division.

Trooper Arnold testified that he summoned the tow-truck in order "to store the vehicle, because we were responsible for the car;" that Appellant Mullin was charged with operating under the influence of narcotics after a negative breathalyzer test (Art. 35, Sec. 100, Ann. Code, 1965 Repl. Vol.), which she voluntarily took and after she admitted taking a named narcotic. He described Kleinbart, when they arrived at the Post, as being "passed out," that his legs were jumping up and down and with his eyes closed, his head was bobbing back and forth. He carried a Selective Service card issued in the name of Albert Feldman.

At about 2:20 p.m. the same afternoon, Trooper Arnold had noticed Kleinbart in the vicinity of Hillcrest Heights Apartments, to which the Trooper had been dispatched to answer a domestic complaint, when he saw Kleinbart walk past him in an alley toward the Apartments.

Shortly after 4:00 p.m. (approximately one and one-half hours after the arrests) Trooper Arnold went to the service station to which the car had been towed and "to protect the property" removed from it clothing which was piled on the back seat, "checkbooks from up front" and from the trunk, "jewelry, watches and film," apparently in suitcases. He testified he removed the property in order that it could be stored at State Police Barracks "H". After having locked the car at the service station, he turned over to Corporal Ansell its keys, as well as all the property, so that it could be inventoried. Over

objections by both Appellants, Trooper Arnold described the property he removed as: "Suitcases, clothing; a wig, jewelry, watches, earrings, cuff-links, tie clasps, and film (in one of the suitcases); and checkbooks in a broken paper bag." He testified that as he removed the property from the car, he then suspected that some sort of crime had been committed, "suspected that the articles may have been stolen," since he noticed a different name than the defendant's on a man's engraved watch removed from the vehicle. At the Marlboro Post, at about 4:30 p.m., he marked with his initials for identification purposes, the watch, which he had recovered from the trunk. He further identified, over objections by both Appellants, a suitcase and its contents, a transistor radio, cuff links, a camera and checkbooks.

Trooper Riffee, also attached to the Criminal Investigation Division, testified that on Corporal Ansell's directions he went to the Prince George's Hospital to get Kleinbart to voluntarily return to the Police Post; that at that time he had no knowledge that any crime had been committed, that Kleinbart was not placed under arrest and did agree voluntarily to return to Marlboro with him. He identified at the trial a sport coat as "resembling the one" Kleinbart carried with him after his release from the hospital and which he was wearing at the Police Post.

Corporal Ansell, after having received a large quantity of personal property from Trooper Arnold, directed Trooper Riffee to ask Kleinbart to return to the Police Post in order "to get the property squared away, since a name on some of the property differed from that on the driver's license," and stated it was necessary to list the property and to learn the identity of the owner. When he first saw Kleinbart at about 8:30 p.m., he told the Corporal that he knew nothing about the property and that it was not, to his knowledge, stolen. Corporal Ansell acknowledged that since there was no report at that time of any of the property having been stolen, Kleinbart was not charged nor was he suspected of any crime; he made several telephone calls to persons whose names appeared on some of the property and spoke to Gerald Matthew LeCompte (who lived in Hillcrest Heights and who returned to his apartment about 7:00 p.m. to discover his apartment had been broken into and

ransacked, and that his clothing and jewelry, as well as the clothing and jewelry of Miss Wilson, had been stolen). Le-Compte was requested to come to the Marlboro Post and upon his arrival, between 9:15 and 9:30 p.m., Corporal Ansell drove to Cole's Amoco Station to which the Ford had been towed. It was there parked in full view, within 40 feet to 50 feet from the front door and brightly lighted. On this trip, the Corporal unlocked the car and the trunk and removed still additional property—a tape recorder from the trunk and six (6) cancelled checks "from up front." He explained the purpose of this entry into the car by stating that Trooper Arnold had not removed all the property which was in the car, that he decided "to go back up and get (the remaining property)" and "finish cleaning out" the car in LeCompte's presence in order to see if any of it belonged to LeCompte.

Corporal Ansell further testified that at the Police Post both LeCompte and Kleinbart stated that they had never seen each other before, that LeCompte identified as his the sport coat which Kleinbart was wearing and that Kleinbart had dropped on the floor under the chair in which he was seated a "chain wristwatch" which LeCompte identified as his property.

Appellant Kleinbart was then taken before a Justice of the Peace and charged with breaking and entering, his fingerprints were taken and he was incarcerated in default of bail.

Mrs. Mullin was arrested the following day, at about 12:30 p.m. at her residence on a warrant charging her also with breaking and entering and was released on bail.

Corporal Ansell identified, over objections by Appellants, as exhibits in the case, the articles which had been turned over to him by Trooper Arnold, as well as articles he removed from the vehicle and testified as well that a large quantity of clothing, comprising twelve (12) pairs of slacks, two (2) sport coats, a gray suit, a woman's wig and three (3) necklaces, after having been listed, were turned over to LeCompte upon his identification of them.

It was stipulated in the trial that there were no search and seizure warrants issued for either entry into the automobile.

Objections were also seasonably made by each Appellant to the introduction into evidence of seven (7) exhibits: the en-

graved watch, a suitcase containing a jewelry box in which there were ten (10) pairs of cuff links, a checkbook, a separate pair of cuff links, the sport coat (worn by Kleinbart) and the tape recorder and cancelled checks—all of which were identified by LeCompte as his property. Objection to the introduction of the "chain wristwatch" (dropped on the floor under the chair) was sustained since it was not named in the Indictment as being among the property taken from LeCompte's apartment.

At the close of the evidence offered by the State, each of the Appellants, under Maryland Rule 755(b), made a Motion for Judgment of Acquittal and when their Motions were respectively denied, offered no evidence in defense.

As in the lower court, Appellants here contend that the searches of the automobile and the seizure of the personal property therefrom during the entries made, respectively, at about 4:00 p.m. and again at about 9:30 p.m. were unreasonable and unlawful. They urge that the holdings of the United States Supreme Court in *Preston v. U. S.,* 376 U. S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964) and *Henry v. U. S.,* 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959) compel the conclusion that the searches and seizures, being too remote in time and in place to be treated as incidental to their arrests, were unlawful. Each also contends that under the holdings in *Jones v. U. S.,* 362 U. S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960) and *Banks v. Pepersack,* 244 F. Supp. 675 (1965) (U. S. Dist. Ct., Md.), they, as occupants, each had standing to object to the searches and seizures.

Appellee contends that there were no actual searches of the car and no seizure of its contents, but they were merely "taken into protective custody" by the officers; that the property in the car was seized in a legal sense only after the police learned from LeCompte of the breaking and entry of his apartment and the larceny of his goods and after Kleinbart "denied any knowledge of the property" and that at that point the items in the car were contraband and were lawfully subject to seizure. Appellee contends that the case is controlled by the holdings in *Jenkins v. State,* 232 Md. 529, 194 A. 2d 618 (1963) and *Knotts v. State,* 237 Md. 417, 207 A. 2d 100 (1965) ; that the

facts here are not within the holdings in *Preston* but within the rationale of *Cooper v. California*, 386 U. S. 58, 87 S. Ct. 788, 35 L. W. 4209 (1967). It is further urged that since the Appellants denied any possessory interests in the contents of the vehicle, they have no standing to object.

· The offense of driving a motor vehicle while under the influence of intoxicating liquor or narcotic drugs (Art. 66½, Sec. 206, *supra*) is not one of the offenses for which a resident of the State has the right to demand a summons in lieu of being taken into custody for the offense. See Art. 66½, Sec. 324 (Ann. Code, 1967 Repl. Vol.). For this misdemeanor, committed in Trooper Blazejak's presence, Appellant Mullin was subject to arrest and as an incident to such arrest, Trooper Blazejak would have been entitled to have made a search of the vehicle which she was operating. *Jenkins v. State, supra; Braxton v. State,* 234 Md. 1, 197 A. 2d 841 (1964) ; *Knotts v. State, supra; Shipley v. State,* 235 Md. 408, 201 A. 2d 773 (1964) ; *Edwards v. Warden,* 238 Md. 646, 647, 210 A. 2d 526 (1965), cert. denied, 382 U. S. 896; and *Crumb v. State,* 1 Md. App. 98, 107, 227 A. 2d 639 (1967).

A "search" as within the ambit of the protection of the Fourth Amendment, implies some exploratory investigation. It is not a search to observe that which is open and patent. *Kershaw v. State,* 199 Md. 135, 139, 85 A. 2d 783 (1952) and cases therein cited. It was not a "search" when Trooper Blazejak saw articles of clothing apparently thrown on the rear seat of the vehicle. He was unable, at the time of the trial, to describe the clothing he had seen ; he did not seize it.

In *Preston v. U. S., supra,* petitioners were arrested for vagrancy after they had been found parked for several hours, acting suspiciously, in a business district. After being searched for weapons, they were incarcerated. The car, which had not been searched at the time of the arrests, was driven by an officer to the Police Station and thence towed to a garage. Later, officers went to the garage and found loaded revolvers in the glove compartment of the car. Being unable to open the trunk, they returned to the station and were directed to go back and enter the trunk through the rear seat of the car. The incrimi-

nating evidence found in the glove compartment and in the trunk was admitted against them in the trial.

The Supreme Court, in unanimously reversing the convictions, said at pgs. 367-8:

> "The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. *Agnello v. United States, supra,* 269 U. S., at p. 31. Here, we may assume, as the Government urges, that, either because the arrests were valid or because the police had probable cause to think the car stolen, the police had the right to search the car when they first came on the scene. But this does not decide the question of the reasonableness of a search at a later time and at another place. See *Stoner v. California, post,* p. 483.[1] The search of the car was not undertaken until petitioner and his companions had been arrested and taken in custody to the police station and the car had been towed to the garage. At this point there was no danger that any of the men arrested could have used any weapons in the car or could have destroyed any evidence of a crime * * * Nor, since the men were under arrest at the police station and the car was in police custody at a garage, was there any danger that the car would be moved out of the locality or jurisdiction. See *Carroll v. United States, supra,* 267 U. S., at 153. We think that the search was too remote in time or place to have been made as incidental to the

---

1. *Stoner v. California,* 376 U. S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964).

> arrest and conclude, therefore, that the search of the car without a warrant failed to meet the test of reasonableness under the Fourth Amendment, rendering the evidence obtained as a result of the search inadmissible."

Prior to *Preston,* the Court of Appeals in *Brown v. State,* 207 Md. 282, 286, 113 A. 2d 916 (1955), had held that "An officer making an arrest, either with or without a warrant, may search *contemporaneously* an automobile connected with the arrest for proscribed property, whether the person arrested is the owner, operator or passenger."

In *Knotts v. State, supra,* the court, in holding that the Appellant had been lawfully arrested for a misdemeanor committed in the officer's presence, and the seizure of a shotgun and cap from his automobile as an incident to his arrest was reasonable, stated: "There was no question here of a delayed search such as that involved in *Preston v. U. S.*"

In *Peal v. State,* 232 Md. 329, 193 A. 2d 53 (1963), an unlocked, unoccupied automobile with open windows was parked on a city street; on its back seat was a large carton labelled as containing ladies' undergarments. When Peal, ascertained to be the registered owner, came to the vehicle, he was taken into custody and voluntarily admitted to the police that as a truck driver for a transport company, he had taken "left-over" cartons of merchandise, after completing deliveries on his truck route, had placed them in his own vehicle and was selling loose merchandise from the car. After this statement was made, the police returned to the vehicle, without a search warrant, and recovered not only the large carton visible on the rear seat, but a smaller carton under the front seat and two cartons from the trunk—all containing ladies' undergarments. In finding that there was probable cause for the search of Peal's automobile and that the search was reasonable, the court said in its opinion, at pg. 333:

> "Manifestly, the search and seizure were not incident to the arrest. The automobile was at one location, the arrest at another. The search was made only after the prisoner was taken to the station house and ques-

tioned, and it stemmed from the confession, not the arrest. Cf. *Busby v. United States,* 296 F. 2d 328 (9 Cir. 1961)."

In *Henry v. U. S., supra,* the Court found that upon the record presented to it, there was a want of probable cause to believe that a crime had been committed. Government agents had gotten "certain information" of an undisclosed nature concerning the implication of one of the defendants with interstate shipments, but as the court said: "But as this record stands what those shipments were and the manner in which he was implicated remain unexplained and undefined." The decision in *Henry* is remarkably similar to that in *Edwardsen v. State,* 231 Md. 332, 336-7, 190 A. 2d 84 (1963), and appears to be inapplicable here.

In *Cooper v. California, supra,* the Supreme Court upheld the warrantless search of a motor vehicle made not incident to an arrest, but a week later, where the petitioner had been arrested for a narcotics violation and his car, impounded by the police, was subject to a statutory forfeiture proceeding because of its use in illegally transporting narcotics. Under California law, in such cases, the police were required to seize the vehicle and hold it as evidence until forfeiture proceedings had been carried to a conclusion.

The Court, in holding that *Preston* was not controlling, said at pgs. 61-2:

"* * * Here the officers seized petitioner's car because they were required to do so by state law. They seized it because of the crime for which they arrested petitioner. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the car—whether the State had 'legal title' to it or not—was closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of

time, had no right, even for their own protection to search it. It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' *United States v. Robinowitz*, 339 U. S. 56, 66. Under the circumstances of this case, we cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence in a forfeiture proceeding."

The rationale in *Cooper* is not here applicable since the contents of the automobile was not contraband and since the car was not required to be seized by any state law, nor was it subject to forfeiture.

Unlike the facts in *Peal, supra,* at the time Corporal Ansell entered the locked vehicle at the service station, at about 9:30 p.m., neither of the Appellants was under arrest in connection with the breaking and entry of LeCompte's apartment, nor had either of them made any confession or incriminating admissions. When, at that time he entered the car "to finish cleaning it out" and for the purpose of seeing if any of the remaining property in the car belonged to LeCompte, under the holdings in *Preston v. U. S., supra,* there was an unreasonable and unlawful search of the vehicle and the removal of the tape recorder from its trunk and the six (6) cancelled checks "from up front" constituted an unreasonable and unlawful seizure of those items. Such search and seizure cannot be considered—remote as it was in time and place—as an incident to Appellants' arrests. At that point there was no danger—indeed no opportunity—that either of them could have used any weapons in the car or could have destroyed any evidence therein. Kleinbart, having returned from the hospital, was then at the Police Post, uncharged with any crime, and Mullin had been then apparently released on bail.

The next question before us is whether, under the facts shown in the record of this case, the removal by Trooper Arnold of the property within the car and the trunk for the avowed purpose "to protect the property" constituted an unreasonable search and seizure in violation of the Fourth Amendment.

In *Jenkins v. State*, 232 Md. 529, 194 A. 2d 618 (1963), two unidentified persons reported to the police that a man in a 1950 green Chevrolet was acting "in a peculiar manner on Manhatten Beach Road." While one of the officers stopped to check for a car of the given description, the other officer proceeded about one-half mile and observed a vehicle of that description approaching him. Turning around, he began to follow the car and instructed the other officer to "flag it down." The car failed to stop; the officer was forced to jump out of its path; a chase began both north and south on the Ritchie Highway. As one police car drew abreast of the pursued vehicle, to attempt to force it to a halt, the driver of the errant car collided with the police vehicle. As the chase continued, the pursued vehicle turned over as it made a turn into Old Annapolis Road. As a result of the accident, whiskey, cigarettes, cigars, knives, confections and a quantity of coins of various denominations spilled out of the overturned vehicle on the ground in plain view of the officers. They took custody of the car and the scattered items; the car was towed to a nearby service station while the recovered property was taken to the Police Station. Less than an hour later, the police received a report that a tavern, about one-quarter mile from where the Chevrolet was first encountered, had been broken into.

Although the court found that no objection had been made to the admissibility of the evidence at the trial, that nonetheless the evidence was admissible, stating at pg. 533 :

> "Unlike the usual cases dealing with searches and seizures which come to us, there was here no actual search. As noted previously, the conglomerate material in the Chevrolet at the time it overturned and appellant was arrested was taken into protective custody by the officers. At that time they were not aware of the breaking and entry which had occurred at Larry's Tavern and only after subsequently learning of this did they *seize* the material *in a legal sense*."

See also, *Rucker v. State*, 196 Md. 334, 76 A. 2d 572 (1950), where lottery slips were found scattered about an automobile which had overturned and additional slips fell out onto the

road when the car was righted by officers who were investigating the accident. It is apparent that the facts in *Jenkins* and in *Rucker* are not similar to those we here have; the vehicle driven by Appellant Mullin was not in any collision, nor was its contents spilled upon the highway. In fact, at the time Trooper Arnold removed the property from it, it was safely parked in the filling station of the police-designated bailee.

In *St. Clair v. State,* 1 Md. App. 605, 232 A. 2d 565, Judge Macgill, for the Court, in a learned opinion made an extensive review and analysis of the decisions throughout the country pertaining to "protective custody" of articles by the police from automobiles.

In that case, a Virginia State Trooper observed St. Clair asleep in his automobile on a State highway near Salem, Virginia, with two (2) television sets in open view on the floor of the vehicle. Appellant told the Trooper that he was enroute from California to look for work in Virginia and Maryland, had arrived late at night and did not want to awaken relatives with whom he intended to stay and who lived nearby. The Trooper knew the named relatives and knew that they lived in the immediate area. Before departing from the scene, the Trooper, in "checking out" the registration of the vehicle, learned by radio that St. Clair was wanted by California authorities for "violation of parole and burglary." Being informed by the Trooper that he would be taken into custody, he requested permission to remove an article of clothing from the trunk and the Trooper then noticed a number of articles therein, all of which he believed to be owned by Appellant. St. Clair told the Trooper that one of the car doors would not lock, that he had "some stuff in the car he didn't want anybody to take," he delivered the keys of the car to the Trooper with the request that they be delivered to his brother-in-law, so that the car could be driven to his nearby residence.

St. Clair was driven by the Trooper to Salem, approximately twelve miles from the scene of the arrest, taken before a Justice of the Peace and incarcerated upon a fugitive warrant on the strength of the teletype the police had received from California authorities. The Trooper returned to the arrest scene with a sergeant so that St. Clair's car could be driven to Salem

and parked near the jail. The Trooper testified that "because we (the police) were responsible for them" the contents of the vehicle, including the trunk, were removed by the State Police, inventoried by serial number and placed in the custody of the Sheriff. About four days later, because of a shortage of storage space in the Sheriff's office, the police were required to put the goods back into St. Clair's car, still parked adjacent to the jail. Twelve days after his arrest, the Virginia State Police ran on teletype a list of the articles removed from the car and on the following day, Prince George's County Police responded to the teletype, reporting that the goods had been stolen in that jurisdiction. Upon that information, the Trooper removed the articles from St. Clair's car and placed them in storage in the State Police Headquarters in Salem. In his prosecution, in Prince George's County for breaking and entering a dwelling house and for grand larceny, the articles removed by the Virginia State Police from his car were admitted into evidence. On appeal, he contended that this evidence had been secured as a result of an unlawful search and seizure.

Judge Macgill, after noting that numerous decisions interpreting *Preston* have concluded that the case does not stand for the proposition that all searches without warrants of a suspect's car, other than at the immediate time and in the immediate vicinity of the arrest, are *ipso facto* unreasonable within the meaning of the Constitution, said in his opinion :

"(A)fter the appellant had been incarcerated in the Salem jail, unable to make bail and facing immediate extradition to California, the police would have been derelict in their duty had they left the vehicle remain at the scene of the arrest, particularly since they knew that it contained a large number of valuable articles, that the door would not lock, and that two television sets were in plain sight in the vehicle. The action of the police in returning the car to Salem could hardly be considered unreasonable and viewed in this light, we think police custody of the vehicle was lawful. When the police thereafter undertook to inventory the contents of the vehicle they did not suspect that any of the articles therein contained had been stolen, and we

are satisfied *on the record before us* that they entered the car for the purpose of safeguarding appellant's personal property—both for their own protection as well as that of appellant—and not for the purpose of making an exploration for incriminating evidence. Had the police suspected that appellant's vehicle harbored evidence of crime, they had the undoubted right to search the vehicle at the scene of the arrest (see *Gaudio and Bucci v. State,* 1 Md. App. 455 (1967))—a right they did not exercise because, as Trooper Rhodenizer testified, he was fully satisfied that appellant owned both the car as well as its contents. The trial judge was clearly so persuaded since *he found as a fact* during the trial that the sole purpose of police in making a list of the property was 'to see that it was preserved against loss for the owner.' " (Italics supplied)

After holding that the removal of St. Clair's property from his vehicle was "reasonable," he stated further in his opinion:

"In holding that the guarantees of the Fourth Amendment were not violated by the action of police in removing the contents of appellant's vehicle *under the circumstances of this case,* we are not unmindful of the difficulty likely to be encountered in distinguishing a *bona fide* inventory from a mere subterfuge to search. But, as pointed out in *People v. Roberts,* 303 P. 2d 721, 724 (Cal. 1956)—a case holding a warrantless search of a home based on an emergency situation to be reasonable under the Fourth Amendment —'The fact that abuses sometimes occur during the course of criminal investigations should not give a sinister coloration to procedures which are basically reasonable.' It is for the trier of fact to see that no subterfuge creeps in and we are here satisfied that none did. See *Davis v. State,* 236 Md. 389 (1964)." (Italics supplied)

The facts upon which the court found in *St. Clair* that there was no "unreasonable" search and seizure are clearly distinguishable, however, from the facts here in the record before

us. Here, each of the Appellants was arrested for misdemeanors committed in Trooper Blazejak's presence, on which charges they were entitled to an immediate hearing or to be released from custody on giving bond or collateral (see Art. 66½, Sec. 320 Ann. Code, 1967 Repl. Vol.); the vehicle was towed for storage, to a designated, selected bailee in whose ability to protect the vehicle the police must have had confidence; the car doors would lock—in fact, Trooper Arnold used the keys to lock the vehicle after removing most of its contents; it was parked in a well-lighted area of the service station; no effort was apparently made to contact Mrs. Smallwood, its registered owner, who lived nearby at Landover, in the same county; there is no showing why, if the avowed purpose was to take "protective custody" of the property, it was not removed contemporaneously with the transportation of the Appellants from the scene of the arrests to the Marlboro Post; there is no evidence that the police did actually believe that the property belonged to either Mullin or Kleinbart. Trooper Arnold searched not only the trunk of the vehicle, but the suitcase in it (a fact inconsistent with "protective custody") and while in the process of removing articles from the vehicle before he transported them to Marlboro "to be inventoried," suspected that they had been stolen; nor did Trooper Arnold remove *all* the contents of the vehicle. Corporal Ansell was required to return to the vehicle that evening "to fininsh cleaning it out." Here, before any of the property was removed, the police were confronted with two persons who, when they arrived at the Police Post, were found to be under the influence of narcotics—with all the connotations and inferences which such facts ordinarily suggest to an experienced criminal investigator, who took over the investigation at that point. Unlike *St. Clair,* Judge Meloy made no finding of fact during the trial that he was satisfied from the evidence presented to him that the removal of the property, at about 4:00 p.m. was solely for the *bona fide* purpose of preserving the property against loss for the owner.

Upon the facts in the record before us, we cannot conclude that the removal of the property from the vehicle and the search of its trunk and the suitcase therein by Trooper Arnold was reasonable and not in violation of the guarantees of the Fourth

Amendment. See *Beck v. Ohio,* 379 U. S. 89, 92-93, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964) and *Sellers v. State,* 237 Md. 58, 61, 205 A. 2d 296 (1964).

See also *People v. Garrison,* 189 Cal. App. 2d 549, 11 Cal. Rptr. 398 (1961); *People v. Lohagen,* 35 Ill. 2d 199, 220 N. E. 2d 201 (1966); *Machlan v. State,* 225 N. E. 2d 762 (Ind. 1967). Compare with *People v. Manzi,* 237 N. Y. S. 2d 738 (1963), Aff'd. 248 N. Y. S. 2d 306 (1964), and *Stewart v. People,* 426 P. 2d 545 (Colo. 1967).

## (b) *Standing to Object*

Prior to the decisions of the United States Supreme Court in *Jones v. U. S.,* 362 U. S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960); and *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), the Maryland Rule was that one could not complain of an illegal search and seizure of premises or property which he did not own, lease, control, lawfully occupy, or rightfully possess, or in which he had no interest. The Rule was enunciated, under the provisions of the Bouse Act (Art. 35, Sec. 5, Ann. Code 1965 Repl. Vol.), in *Baum v. State,* 163 Md. 153, 157-8, 161 A. 244, 245 (1932). It was followed in *Frankel v. State,* 178 Md. 553, 562, 16 A. 2d 93 (1940); *Bevans v. State,* 180 Md. 443, 448, 24 A. 2d 792 (1942); *Resnick v. State,* 183 Md. 15, 18, 36 A. 2d 347 (1944); *Kapler v. State,* 194 Md. 580, 586, 71 A. 2d 860 (1950); *Lambert v. State,* 196 Md. 57, 63-4, 75 A. 2d 327 (1950); *Delnegro v. State,* 198 Md. 80, 86, 81 A. 2d 241 (1951); *Curreri v. State,* 199 Md. 54, 56, 85 A. 2d 454 (1951); *Lingner v. State,* 199 Md. 503, 506, 86 A. 2d 888 (1952); *Cross v. State,* 199 Md. 507, 509-10, 86 A. 2d 891 (1952); *Saunders v. State,* 199 Md. 568, 573, 87 A. 2d 618 (1952); *Rizzo v. State,* 201 Md. 206, 211, 93 A. 2d 280 (1953); and *Manger v. State,* 214 Md. 71, 75, 133 A. 2d 78 (1957).[2]

---

**2.** *Bevans v. State* involved the search of an automobile where appellants disclaimed any interest in the car; *Curreri v. State,* the recovery of race bet slips from a parked truck which belonged to appellant's brother; and *Lingner v. State,* lottery slips in a package in an automobile where appellant stated that two unknown men had thrown it into the car.

In *Jones v. U. S., supra,* the petitioner, who was using an apartment which belonged to a friend and had a key to it with which he had admitted himself on the day of his arrest, was charged with the possession of narcotics following a raid upon the apartment by federal narcotics agents. His Motion to Suppress the evidence seized had been denied on the ground that his position was that of an "invitee or guest" and that he had no standing to object to the search and seizure.

In holding that *Jones* was a "person aggrieved" within the provision of Rule 41(e) of the Federal Rules of Criminal Procedure, the Court said: "The restrictions upon searches and seizures are obviously designed for the protection against official invasion of privacy and the security of property * * * the exclusion in federal trials of evidence otherwise competent but gathered by federal officials in violation of the Fourth Amendment is a means for making effective the *protection of privacy.*"

The Court continued at pgs. 261-62:

> "* * * To establish 'standing,' Courts of Appeals have generally required that the movant claim either to have owned or possessed the seized property or to have had a substantial possessory interest in the premises searched. Since narcotics charges like those in the present indictment may be established through proof solely of possession of narcotics, a defendant seeking to comply with what has been the conventional standing requirement has been forced to allege facts the proof of which would tend, if indeed not be sufficient, to convict him. At the least, such a defendant has been placed in the criminally tendentious position of explaining his possession of the premises. * * *"

In discussing "possession," the dilemma which can be the basis for conviction and at the same time confer standing to object, the Court continued at pgs. 263-4:

> "* * * to hold to the contrary, that is, to hold that petitioner's failure to acknowledge interest in the narcotics or the premises prevented his attack upon the

search, would be to permit the Government to have the advantage of contradictory positions as a basis for conviction. Petitioner's conviction flows from his possession of the narcotics at the time of the search. Yet the fruits of that search, upon which the conviction depends, were admitted into evidence on the ground that petitioner did not have possession of the narcotics at that time. The prosecution here thus subjected the defendant to the penalties meted out to one in lawless possession while refusing him the remedies designed for one in that situation. It is not consonant with the amenities, to put it mildly, of the administration of criminal justice to sanction such squarely contradictory assertions of power by the Government. The possession on the basis of which petitioner is to be and was convicted suffices to give him standing under any fair and rational conception of the requirements of Rule 41(e)."

In pointing out that the determination of constitutional rights should not be based upon common law concepts of property rights, the Court, in its opinion, said at p. 266:

"* * * We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * * Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards."

Following the decision in *Jones,* but prior to the decision in *Mapp,* the Court of Appeals in *Oden v. State,* 222 Md. 325, 159 A. 2d 867 (1960), held that the Appellant, a passenger in the car which was searched and who was not the owner or operator thereof, was in no position to invoke the protection of the

Bouse Act (Art. 35, Sec. 5, Ann. Code, 1965 Repl. Vol.), and stated "He asserts no claim of ownership or of possession of the automobile. The right to object to an unlawful search or other introduction in evidence of the fruits thereof is personal to one whose rights have been violated." *Jones* had been announced in the interval between argument and decision but the Court merely stated that the facts of that case differed from those in *Jones.*

*Mapp v. Ohio, supra,* extended to state criminal prosecutions the prohibition against the use by the state in a criminal proceeding of evidence obtained as a result of an illegal search and seizure. *Buettner v. State,* 233 Md. 235, 239, 196 A. 2d 465 (1964).

*Belton v. State,* 228 Md. 17, 178 A. 2d 409 (1962) (decided after both *Jones* and *Mapp*) held that the Appellant, who was an invitee on the searched premises, had standing to object to the admissibility of the illegally seized evidence. The court held also that as a consequence of *Mapp,* the exception to the Bouse Act concerning narcotics evidence "was rendered unconstitutional." In its opinion, the Court said at pg. 23 :

> "* * * In *Jones v. United States,* 362 U. S. 257 (1960), the Supreme Court, in relaxing the former strict requirements as to standing to object, held that the right was available to anyone legitimately on the premises unlawfully searched. And while it is true that in *Oden v. State,* 222 Md. 325, 159 A. 2d 867 (1960), decided after the *Jones* case, we refused to liberalize the standing-to-object requirements so as to permit the defendant, who was a passenger in an automobile that had been searched, to make an objection, we think the defendant in this case had standing to object. As we see it, the right to object in a case such as this, where the State proposed to use the illegally seized evidence against a defendant who was rightfully on the searched premises, is another necessary result of the *Mapp* decision."

In *Banks v. Pepersack, supra,* cited by Appellants, the U. S. District Court, in a Habeas Corpus proceeding, held as was decided in *Belton,* that the petitioner, although he was an in-

vitee only upon the premises and disclaimed ownership of any of the evidence seized, did have standing, under the holdings in *Jones,* to object to the search made upon the premises. The Court also held that the Bouse Act "had been superseded" by the decision in *Mapp v. Ohio,* applying the exclusionary rule to state prosecutions of all criminal cases, be they felonies or misdemeanors or be they prosecutions for narcotics offenses.

In *Bucholtz v. Warden,* 233 Md. 614, 195 A. 2d 690 (1963), a post-conviction proceeding, where the applicant for leave to appeal had pleaded guilty to burglary on May 19, 1961, the court held that inasmuch as he had denied owning or living in or otherwise having any interest in the apartment (which was searched by police) the police had a right to search it with the consent of the landlord, its owner, and without Bucholtz' consent. The court cited *Baum v. State, supra,* and *Jones v. U. S., supra.* (It must be observed, however, that his conviction had become final before *Mapp v. Ohio, supra,* was handed down. See *Linkletter v. Walker,* 381 U. S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965).)

However, in *Carter & Gray v. State,* 236 Md. 450, 453-4, 204 A. 2d 322 (1964), in a post-*Jones* and post-*Mapp* case, Appellants were passengers in a car owned and operated by Foot; officers approached the parked vehicle and with Foot's permission, searched it. Heroin was found under the right front seat where Carter was sitting. Appellants contended that Foot's consent to search the car was not voluntarily given and that the evidence recovered from them, as a result of a search to which they did not consent, could not be used against them. The trial court had found as a fact that Foot did freely give permission to the officers to search his vehicle. Although neither of the Appellants had at the time objected to the search of the automobile, the Court of Appeals, citing the rule enunciated in *Baum v. State, supra,* found that they had no standing to object since "they had no ownership or possessory rights of any kind in the car." In holding that the facts in the case did not fall within the ambit of *Jones,* the Court said that the Appellants "did not own or control the automobile which was searched and were not in possession of it." The Court further distinguished *U. S. v. Peisner,* 311 F. 2d 94 (Fourth C.C.A.) (1962) by pointing

out that in that case the Government conceded that Peisner, a passenger in the automobile, had a property interest in the literature which was seized from the automobile and that he was a "proper party" to move for the suppression of the evidence seized.

More recently, in *McChan, et al. v. State*, 238 Md. 149, 207 A. 2d 632 (1965), cert. denied 384 U. S. 1021, the Court of Appeals citing *Carter* again stated that "the right of immunity from unreasonable search and seizure is personal and one who *disclaims* ownership or other possessory interest has no right to protest the legality of a search and seizure."

In *Stewart v. State*, 1 Md. App. 309, 229 A. 2d 727 (1967), we had occasion to point out at pg. 314 on the authority of *McChan, supra,* and *Carter, supra,* as well as *Lingner, supra,* that "Maryland follows the majority view of the federal and state courts, requiring the objector to present to the court an alleged violation of his own constitutional rights as a prerequisite to his right to object to 'tainted' evidence."

On May 29, 1967, the United States Supreme Court in *Warden, Maryland Penitentiary v. Hayden*, 387 U. S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782, overruled *Gouled v. U. S.*, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647 (1921) and held that "mere evidence" of crime might be lawfully seized.

Mr. Justice Brennan, who delivered the opinion for the majority re-stated the views set forth in *Jones, supra,* that property interests should not be the controlling consideration in search and seizure cases. He stated at p. 304 :

"The premise that property interests control the right of the Government to search and seize has been discredited. Searches and seizures may be 'unreasonable' within the Fourth Amendment even though the Government asserts a superior property interest at common law. We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts. See *Jones v. United States*, 362 U. S. 257, 266; *Silverman v. United States*, 365 U. S.

505, 511. This shift in emphasis from property to privacy has come about through a subtle interplay of substantive and procedural reform."

After citing from *Jones v. U. S., supra,* he continued at pgs. 305-6:

"* * * And with particular relevance here, we have given recognition to the interest in privacy despite the complete *absence of a property claim* by suppressing the very items which at common law could be seized with impunity: stolen goods, *Henry v. United States,* 361 U. S. 98; instrumentalities, *Beck v. Ohio,* 379 U. S. 89; *McDonald v. United States, supra;* and contarband, *Trupiano v. United State,* 334 U. S. 699; *Aguilar v. Texas,* 378 U. S. 108." (Italics supplied)

Finally, it is stated, at pg. 307:

"The remedy of suppression, moreover, which made possible protection of privacy from unreasonable searches without regard to proof of a superior property interest, likewise provides the procedural device necessary for allowing otherwise permissible searches and seizures conducted solely to obtain evidence of crime. For just as the *suppression of evidence does not entail a declaration of superior property interest in the person aggrieved,* thereby enabling him to suppress evidence unlawfully seized despite his inability to demonstrate such an interest (as with fruits, instrumentalities, contraband), the refusal to suppress evidence carries no declaration of superior property interest in the State, and should thereby enable the State to introduce evidence lawfully seized despite its inability to demonstrate such an interest. * * *"

See *Cotton v. U. S.,* 371 F. 2d 385 (1967) where the Ninth Circuit Court of Appeals held, on the authority of *Jones v. U. S.,* that Cotton, who was in possession of a stolen vehicle, had "standing" to move to suppress evidence resulting from the search of the vehicle even though his presence in the car

was wrongful. The Court, in its opinion, said: "No doubt the Supreme Court would deny standing to a trespasser or a burglar who had entered another's home and was in there when the home is searched. But even a trespasser, if he has also taken actual possession of the premises, acquires possessory rights against all the world except the true owner." The Court held that the rule was applicable to chattels and to automobiles.[3]

In this case, Appellant Mullin was operating her sister's automobile; there was no showing that it was being driven without Mrs. Smallwood's permission. She was in possession of the automobile at the time of her arrest; under these facts, she had standing to object as she did to the introduction of the evidence obtained as a result of the several seizures of the articles from the automobile. *Oden v. State, supra.*

Appellant Kleinbart was a passenger in the car immediately prior to his arrest; having been found in it, he could not avoid being identified with it and its contents. Unlike the facts in *Carter & Gray v. State, supra,* there was no consent by Mrs. Mullin (as the operator) to a search of the vehicle. Kleinbart did not disclaim any association with the property removed from the car; he told Corporal Ansell, upon his return from the hospital on the evening of May 25th, that "He didn't know anything about the property;" that "He remembered some property being in the car, but that to his knowledge it was not stolen."

⟨ The record before us discloses that the State successfully argued for the conviction of each of the Appellants of grand larceny upon the fact that they were in possession of recently stolen property, which possession, when unexplained or unrebutted, constituted *prima facie* proof that they were the thieves. Neither Appellant offered evidence in their own behalf. The inferences of fact from such possession was the basis for their convictions. *Debinski v. State,* 194 Md. 355, 360, 71 A. 2d 460 (1950) ; *Felkner v. State,* 218 Md. 300, 305, 146 A. 2d 424 (1958) ; *Jordan v. State,* 219 Md. 36, 46, 148 A. 2d 292 (1959) cert. denied 361 U. S. 849; *Cason v. State,* 230 Md. 356, 358,

3. See also, *U. S. Ex Rel. DeForte v. Mancusi,* 379 F. 2d 897, 36 L. W. 2022 (Second Cir.) (1967).

187 A. 2d 103 (1963); *Anglin v. State,* 1 Md. App. 85, 92, 227 A. 2d 364 (1967).

As pointed out in *Jones v. U. S., supra,* he was subjected to the penalties meted out to one in lawless possession while refused the remedy designed for one in that situation.

We know of no logical reason why there should be a valid distinction between an invitee-occupant of premises and an invitee-passenger of a motor vehicle. As recently re-stated by the United States Supreme Court in *Hayden,* the principal object of the Fourth Amendment is the protection of privacy rather than property. It was not necessary for Kleinbart to show a superior property interest in the articles removed from the vehicle to give him "standing" to make the objections he made to the introduction into evidence of that property; his presence in the car, under the circumstances, gave him standing to object to the property being admitted in evidence.

It was prejudicial error to each of the Appellants when their objections to the introduction of the evidence were overruled.

### (c) *Sufficiency of the Evidence*

Since the judgments against each of the Appellants must be reversed for the reasons hereinabove set forth and the case remanded for a new trial, it is not necessary that we pass upon their contentions that the evidence was insufficient to sustain their convictions.

### (d) *Statement of Mullin*

Appellant Mullin contends additionally that her oral statement was improperly admitted into evidence because of the failure on the part of the prosecution, as a prerequisite to its introduction, to show a compliance with the holdings in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) and in particular, to show that she was advised that an attorney would be provided for her if she were an indigent.

Corporal Ansell testified that Mrs. Mullin, both at her home when she was arrested and again at the Marlboro Post "was advised of her rights"—"was told that anything she said would be used against her, that she had a right to contact an attorney prior to making any statement and that she didn't have to tell me anything."

In *Miranda,* the United States Supreme Court laid down new standards governing in-custody interrogation requiring that the prosecution show:

"* * * (1) advice to the prisoner in clear terms that he had a right to remain silent; (2) a thorough understanding that anything he said may be used against him in Court; (3) a clear understanding that he had a right to have a lawyer with him during the questioning and consult with him from time to time; (4) that if the prisoner was indigent, a lawyer would be appointed to represent him. * * *" [4]

In *Johnson & Cassidy v. New Jersey,* 384 U. S. 719, 86 S. Ct. 1772, 34 L. W. 4593 (1966), the Court held that these new standards were applicable to persons whose trials commenced as of June 13, 1966. The trial of the Appellants began on August 11, 1966 and hence the standards promulgated in *Miranda* were applicable.

The short answer, however, to Appellant Mullin's contention is that no objection was made on her behalf to the admissibility of the oral statement. Her failure to object must be treated as a waiver of any objection she had. Maryland Rule 522(d)2; *Porter v. State,* 230 Md. 535, 537, 187 A. 2d 870 (1963) ; and *Gaudio & Bucci v. State,* 1 Md. App. 455, 461-2, 230 A. 2d 700 (1967).

Since the case against her must be remanded for a new trial, we call attention to our decision in *Robinson v. State,* 1 Md. App. 522, 527, 231 A. 2d 920 (1967).

> *Judgments reversed and case remanded for a new trial.*

---

4. *Robinson v. State,* 1 Md. App. 522, at pgs. 525-6.