# CLYDE GEORGE DIXON *v.* STATE OF MARYLAND

[No. 970, September Term, 1973.]

*Decided October 14, 1974.*

20

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*Gerald A. Kroop* for appellant.

*Leroy Handwerger, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Richard J. Kinlein, State's Attorney for Howard County* and *Allen Horvitz, Assistant State's Attorney for Howard County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

With the possible exception of the "dropsy" cases,[1] no aspect of Fourth Amendment litigation has afflicted law enforcement with the yawning credibility gap wrought by

---

1. For an incisive analysis of this remarkable phenomenon, see Judge Irving Younger in *People v. McMurty,* 64 Misc. 2d 63, 314 N.Y.S. 2d 194 (N.Y. City Crim. Ct. 1970). And see generally Comment, *Police Perjury in Narcotics "Dropsy" Cases: A New Credibility Gap,* 60 Georgetown L.J. 507 (1971).

inventory searches. The conviction of the appellant, Clyde George Dixon, by Judge James Macgill in the Circuit Court for Howard County for (1) driving while under the influence of drugs in contravention of Article 66$^1$/$_2$, Section 11-902 (a), and (2) possession of barbiturates, occasions a hard look at the particular "inventory search" relied upon in this case specifically and at the constitutional validity of the inventory-search rationale generally.

## *The Factual Background*

But for the all-too-real discomfiture of the appellant, the misadventure that brought him to his present sad estate was vintage Buster Keaton. At 11 a.m. on November 6, 1972, he pulled innocently onto the parking lot adjacent to the Howard County Courthouse in Ellicott City and committed the fatal blunder of parking in a "no parking space" under the watchful eye of the Howard County Central Alarm headquarters. Thirty minutes later the episode was over, with the appellant in full custodial arrest, his car impounded and searched, and himself charged with the possession of barbiturates found in the course of that search. Juridically as well as botanically, "great oaks from little acorns grow."

The Courthouse and the Central Alarm headquarters occupy two sides of a common parking lot in Ellicott City. Immediately in front of Central Alarm, on November 6, 1972, were parked two large and mobile emergency generators. Beside (or perhaps between) the generators were three "no parking spaces," also immediately in front of Central Alarm. John Earp — a dispatcher for Central Alarm — was watching from the open doorway of his headquarters, which was up one flight of stairs and commanded a good view of the parking lot, as the appellant initially moved onto and across that lot. The appellant attempted to back his car into one of the prohibited spaces, a move requiring a sharp left-hand turn because of the generators. In the course of the maneuver, the left front fender of the appellant's car struck one of the parked generators. The appellant, without any apparent undue effort, then simply pulled forward and

renegotiated his way into an adjacent but also prohibited space. Earp called the police.

Earp then accosted the appellant and reminded him that he had bumped the generator. The appellant replied that "it didn't seem to be damaged too bad" and, according to Earp, "seemed to be indifferent to the fact." Dismissing the subject of the accosting, the appellant then asked Earp for and received directions to the jail, which was one floor below Central Alarm. Chagrined at the appellant's nonchalance, Earp then placed a second call to the police to inform them that the subject of the first call had "left my location and gone down to the jail." Earp positioned himself on a catwalk outside Central Alarm and maintained his vigil. Shortly thereafter, the appellant left the jail and started up the stairs to the parking lot level. Earp observed him "stumble" (but not fall) as he climbed the stairs. The appellant immediately regained his balance and walked across the parking lot toward the Courthouse. In going around a solid rank of parked cars, the appellant, still under Earp's surveillance, "walked into the back of a car parked right on the corner, at which time he — then he continued toward the Courthouse." Earp placed yet a third call to the police to keep them current on the appellant's movements. A few minutes later, Earp observed the appellant return from the Courthouse toward his car. A fourth call was placed to the police. Earp, now partially distracted by other duties, finally observed the appellant getting into his car and leaving the parking lot. Earp conceded that, generally speaking, the appellant "seemed to be walking fairly normally" and that nothing was unusual about his breath.

The only other witness in the case was Patrolman First Class Steven Greisz of the Howard County Police Department. He, with his partner, was on routine patrol north of Ellicott City when he received a radio dispatch that "a parking violation" had occurred "in the Courthouse parking lot." When the officers arrived at the scene, the appellant had not yet returned to his vehicle. Instead of routinely writing out a ticket and leaving it under the windshield wiper, the officers ran a computerized check on

the car and "found it not to be stolen and so forth." The testimony is somewhat equivocal as to whether or not the officers deliberately waited for the parking violator to return to the scene of his violation rather than simply leave the ticket and move on. On cross-examination, Officer Greisz asserted that the appellant returned to his car before the writing of the warning ticket was completed. On direct examination, Officer Greisz characterized his attitude as, "While we were there, hopefully awaiting the occupant or the driver to come to the car . . . ." In any event, the appellant returned. Officer Greisz accosted him, "Sir, would this be by any chance your vehicle?" The appellant acknowledged that the car belonged to his sister (who lived with him in Baltimore) but that he had been driving it. Upon demand, the appellant produced license and registration card, both of which were in good order. The officer served a warning ticket on the appellant for the parking violation and asked the appellant to move the car. The appellant got in the car and Officer Greisz, with his partner, ostensibly left the area.

They moved, however, only so far as a contiguous "back parking lot" in order to maintain a discreet surveillance on the appellant. In the course of this move, they "lost him." The appellant had apparently walked back to the Courthouse. The officers immediately returned to the scene of the parking violation and soon located the appellant. Officer Greisz told him that if he did not move the car immediately, he would receive a ticket instead of a mere warning. The appellant, at this urging, then moved his car to the "back parking lot." The officers followed him closely. Under their scrutiny, the appellant blundered again. He attempted to park in "a striped area which is not a designated parking space" instead of in a proper area which is "designated by white lines in the back Courthouse parking lot." Officer Greisz "advised him that he had to park in a proper space, which he did at that time." The officers, ultimately mollified, drove off.

Although the ultimate characterization of the appellant by Officer Greisz was an amalgam of observations made

during this initial encounter and twenty minutes later at the time of the appellant's arrest, the bulk of the characterization refers to the appellant during the initial encounter. Officer Greisz summarized:

> "I observed, as I said, at the time of arrest and also at the time I issued Mr. Dixon his warning in the parking area down in front of Central Alarm headquarters, that his breath was apparently normal. There was no — I couldn't detect any odor of alcohol on his breath at that point. The color of his face was normal, his clothes were in an orderly fashion. His attitude during a majority of the, my confrontation with him, was polite and cooperative. He had, as far as I know, no unusual actions, no profanity or anything like this. He eyes were slightly bloodshot, his balance was fair [2] and his walk was fair. His turning ability was fair. His speech was slurred."

As to the initial encounter, the bottom line is that the officers, after speaking with the appellant and after observing him drive his car, were satisfied to let the warning for the parking violation suffice. The incident as far as they were concerned having ended, they drove off.

Some twenty minutes later, the two officers were at the Golden Triangle Shopping Center at the intersection of Route 40 and Route 29 when a second of the calls, of the total of four dispatched by Earp to the police, caught up with them. Not comprehending that the initial complaint had come in four times and that they were still getting (and were yet to get) repetitions of the complaint which they had already handled, the officers obviously surmised that the appellant was back down in the prohibited parking space in front of Central Alarm, from which they had driven him twenty minutes earlier. The officers hurried back to the Courthouse. As they climbed the steep hill of Court Avenue

---

**2.** It was developed on cross-examination that "fair" is part of a scale that runs "sure, fair, swaying, wobbling, saggy knees, crawling, and others." Officer Greisz acknowledged that on a scale of 1 through 7 numerically, "fair" is "second to the top."

in their final approach to the Courthouse, yet a third of the original four complaints caught up with them. It was the one that informed them that the appellant had bumped into the generator. They concluded that this had happened as they were hurrying back to the scene. These two anachronisms were uppermost in the minds of the officers when they approached the Courthouse and "observed the car on the back parking lot in motion." They turned on their emergency lights, moved to the rear of the appellant's car and motioned for the appellant to stop. He stopped. Officer Greisz immediately advised the appellant "that I was placing him under arrest at this point for driving while intoxicated." Without another observation being made or another word being said, the appellant was removed from his vehicle. According to Officer Greisz, "At this point he was searched, a frisk search for weapons at that point, and advised he was under arrest. He was placed in the police vehicle and advised of his Miranda rights."

A subsequent search of the appellant's automobile produced from the back seat two white tablets, which were analyzed and found to be controlled barbiturates. The critical character of that seizure is patent, since the two tablets were the gravamen of the possession charge, on which the appellant was convicted and sentenced to a term of eighteen months. They were also indispensable exhibits in proving the charge of driving while under the influence of a drug, for which the appellant was sentenced to a term of six months to be served concurrently with the other sentence. We turn now to the legitimacy of that seizure.

## I

### Search Incident and Carroll Doctrine Rationales Inapplicable

Of the recognized exceptions to the warrant requirement, *Katz v. United States*, 389 U. S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); *Coolidge v. New Hampshire*, 403 U. S. 443, 454-455, 91 S. Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971), neither the search incident to a lawful arrest nor the

so-called "automobile exception" (the *Carroll* Doctrine) need detain us long.

The search of the automobile cannot be legitimated as an incident of the appellant's arrest for several quite distinct reasons. At the very threshold of search incident theory, the search must be incident not merely to an arrest but to a *lawful* arrest. A violation of Article 66½, Section 11-902 (a), is a misdemeanor. A warrantless arrest for a misdemeanor is permitted only when the misdemeanor occurs in the presence of the arresting officer. When the officers returned to the Courthouse parking lot, they observed nothing but the appellant driving his automobile on the back parking lot of the Courthouse. Under our obligation to make an independent review of the evidence where constitutional issues are involved, we find as a constitutional fact that no probable cause existed to arrest the appellant for driving while intoxicated. Even permitting the officers their mistaken beliefs produced by the communications mix-up, we do not find that parking in a prohibited parking space or even bumping into a generator add up to probable cause to believe that the driver is intoxicated. Indeed, full personal observation of the appellant's speech and behavior some twenty minutes earlier had not led the officers to any such conclusion. Without a lawful arrest, there can be no constitutional search incident.

Even if the arrest had been lawful, however, the search was not "essentially contemporaneous" with the arrest. It occurred a short, but nevertheless significantly measurable, time thereafter. The unity of time was not satisfied. *Preston v. United States,* 376 U. S. 364, 84 S. Ct. 881, 11 L.Ed.2d 777 (1964). The search was, furthermore, beyond the permitted search perimeter of *Chimel v. California,* 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969). The State urges strenuously upon us *United States v. Robinson,* 414 U. S. 218, 94 S. Ct. 467, 38 L.Ed.2d 427 (1973), and *Gustafson v. Florida,* 414 U. S. 260, 94 S. Ct. 488, 38 L.Ed.2d 456 (1973), as legitimating a full search incident after a traffic arrest. The principle of *Robinson* and *Gustafson* is not here apposite. They dealt with the purpose of a search incident and not its geographic

range in space. They did not purport to alter, and indeed did not alter, the "wingspan" limitation of *Chimel*, whereunder a search incident is limited to that area within the lunge, within the reach, within the grasp of the arrestee — the area "which may fairly be deemed to be an extension of his person" — the area within which the arrestee might grab for weapons or destroy evidence. In the instant case, the appellant-arrestee was safely ensconced in the police car when the search of his own automobile took place some appreciable distance away — clearly beyond his "wingspan."

Nor may the State rely upon the so-called "automobile exception" under *Carroll v. United States*, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). Neither of the constitutional prerequisites — probable cause to believe that the automobile contained evidence of crime and exigent circumstances — was established. The State, indeed, eschewed all reliance upon "automobile exception" theory.

## II

### *The Inventory Search as a Launching Pad for a Plain View Doctrine Seizure*

Before analyzing the "inventory search" in issue, it is initially necessary to place inventory searches generally in their proper analytical frame of reference. An inventory search of an automobile is not an automobile search within the meaning of the "automobile exception." Untold confusion has resulted from the mistaking of functional categories for analytical categories. Many examinations of the interior of an automobile, functionally speaking (that is, an inspection for some purpose or another of a vehicle that has four wheels and a motor), have nothing whatsoever to do with the "automobile exception," analytically speaking. *Preston v. United States, supra,* involved the search of an automobile, but was a "search incident" case and not an "automobile exception" case, analytically speaking. And see *Howell v. State*, 18 Md. App. 429, 306 A. 2d 554 (1973), reversed on factual insufficiency but preserving the frame of analysis in *Howell v. State*, 271 Md. 378, 318 A. 2d 189 (1974).

*Harris v. United States,* 390 U. S. 234, 88 S. Ct. 992, 19 L.Ed.2d 1067 (1968), involved the seizure of an incriminating item of evidence from an automobile but was a Plain View Doctrine case and not an "automobile exception" case, analytically speaking. A similar dichotomy between the literal probing into an automobile, functionally speaking, and a Plain View Doctrine seizure, analytically speaking, occurred in *Cady v. Dombrowski,* 413 U. S. 433, 93 S. Ct. 2523, 37 L.Ed.2d 706 (1973).

Conversely, all searches and seizures involving the "automobile exception" (or preferably, the Carroll Doctrine), do not necessarily involve actual automobiles or other vehicles, in the functional sense. The search of suitcases and other moveable boxes, cartons and containers are "automobile exception" (or Carroll Doctrine) cases, in the analytical sense, even though not involving automobiles or other vehicles, in the functional sense. *Waugh v. State,* 20 Md. App. 682, 318 A. 2d 204 (1974); *People v. McKinnon,* 103 Cal. Rptr. 897, 500 P. 2d 1097 (1972); *United States v. Valen,* 479 F. 2d 467 (3rd Cir. 1973). The distinction was well illustrated by the Supreme Court in *Coolidge v. New Hampshire, supra,* when in Part II of its opinion it dealt with the search of the same automobile, in the literal and functional sense of the word, under three separate analyses — Part II-A applying a "search incident" analysis to the search of the car, Part II-B applying an "automobile exception" analysis to the search of the car and Part II-C applying a Plain View Doctrine analysis to the search of the car.

Confusion would be avoided if lawyers and courts would remember that what triggers an "automobile exception" analysis is not the presence of an internal combustion engine connected with a set of wheels but rather an argument based upon the conjoining of probable cause and exigent circumstances. A reverting to the older usage of "Carroll Doctrine" as the appropriate label for this recognized exception to the warrant requirement might avoid much of the confusion engendered by the word "automobile's" having both a functional and an analytical connotation.

In terms then of constitutional significance, it becomes preeminently clear that an inventory search of an automobile is not an "automobile exception" case. The inventory search, by definition, purports to be a mere listing of personal property and not a deliberate search for evidence. The "automobile exception" search is a deliberate search for evidence. An inventory search is not based upon probable cause; an "automobile exception" search must be based upon probable cause to believe that the automobile contains evidence of crime. The inventory search need not be based upon any exigency; the "automobile exception" search is absolutely dependent upon the presence of exigent circumstances.

If an inventory search of an automobile is not an "automobile exception" search, what then is it? Assuming for the moment that the making of an inventory is a legitimate excuse for intruding into the constitutionally protected area of a man's automobile, it is clear that that entry is a "prior valid intrusion," one of the two necessary elements to bring into play the Plain View Doctrine. Once there has been a prior valid intrusion, if there is then an inadvertent spotting of evidence of crime in plain view, that evidence may be seized under the Plain View Doctrine. *Coolidge v. New Hampshire, supra; Brown v. State,* 15 Md. App. 584, 292 A. 2d 762 (1972). A review of inventory searches, therefore, proceeds under a Plain View Doctrine analysis.

## III

### No Probable Cause to Believe
### Pills in Plain View Were Contraband

Assuming again that the making of an inventory (if bona fide) is a legitimate excuse for intruding into the constitutionally protected area of a man's automobile, entry into the automobile in pursuit of that purpose would constitute a prior valid intrusion. And there is no question but that the two pills ultimately seized in this case were

inadvertently spotted and that they were literally in plain view:

> "A. As I said, I was searching for valuable personal property, to keep for the defendant, so nothing would happen to it. There was nothing in the front area of the car. The vehicle had bucket seats. I moved the bucket seat on the passenger side forward, and immediately upon looking into the back seat, on, in plain view, on the back seat —
>
> Mr. Kroop: Object again, to the characterization, Your Honor. Apparently he's been reading several cases of the Court of Special Appeals.
>
> THE COURT: Maybe he's heard counsel.
>
> Mr. Kroop: We'll object to that. Key words are coming out.
>
> THE COURT: Well, just — I can't object to his using the language the rest of us use. Go ahead.
>
> A. On the back seat of the vehicle I observed two pills.
>
> BY MR. HORVITZ:
>
> Q. And what, if anything, did you do with these pills?
>
> A. I took the pills into my possession and placed them in an envelope at that point.
>
> Q. And —
>
> A. I'm not sure if I placed them in the envelope then or at the station, but at any rate I confiscated the pills at that point."

It is equally clear that Officer Greisz had no probable cause to believe that the pills were contraband, but nevertheless arbitrarily escalated his effort from the protective listing of personal property to an investigative "fishing expedition" for criminal evidence:

> "Q. All right, now, these two pills, you had no idea what they were, did you?
>
> A. No, sir, no idea.

Q. Of course, you told Judge Macgill the reason you went through the vehicle was for this client, the defendant's protection?

A. Yes, sir, it's our policy, in the police department.

Q. Right. I mean, you want to protect and secure everything that he had.

A. Yes, sir.

Q. Is that correct? And when you saw these two pills you had no more idea whether they were aspirin or sleeping pills or whatever, isn't that correct?

A. That's correct, sir.

Q. All right. Yet you took them out in an envelope for his security? Or did you take them out with the idea that you wanted to test them, to see if they were a prohibited drug?

A. Well, I recovered them, and after bringing them from the car I decided to have them tested.

. . . .

A. . . . The search was done as an inventory. It just so happened that I viewed the pills.

Q. Oh, I understand that, but you've already told us that you took the pills, not for his safekeeping, but for the purpose of trying to obtain evidence to be used against this man in a court of law?

A. Yes, sir."

It is beyond cavil that a prior valid intrusion will not in and of itself justify an indiscriminate seizure of all items that happen to be visually in plain view, but that probable cause must exist to believe that the items ultimately seized are, indeed, contraband or other evidence of crime. The point was dealt with by the three justices of the Supreme Court in *Stanley v. Georgia*, 394 U. S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542 (1969), who reached the Fourth Amendment issue in the case. In that case, Georgia law enforcement officers searched Stanley's home under a valid warrant authorizing them to search for evidence of illegal bookmaking. In the

course of the search, the officers seized reels of film which were ultimately determined to be pornographic. The six-justice majority opinion dealt only with the First Amendment issue, whereunder the Georgia law proscribing the possession of obscene matter in the privacy of a home was held to be unconstitutional. Justices Stewart, Brennan and White concurred, reaching, however, the Fourth Amendment issue. They found the seizure of the reels of film to have been "unwarranted and unconstitutional" because they were not particularly described in the warrant and because, although the reels were literally in plain view, there was no probable cause to believe that they were contraband:

> "This is not a case where agents in the course of a lawful search came upon contraband, criminal activity, or criminal evidence in plain view. For the record makes clear that the contents of the films could not be determined by mere inspection." *Stanley v. Georgia*, 394 U. S. at 571, 22 L.Ed.2d at 553 (concurring opinion by Steward, J.)

An excellent summary of the cases and authorities on this point is found in the opinion of Justice James N. Bloodworth for the Supreme Court of Alabama in *Shipman v. State*, 282 So. 2d 700. In that case, several individuals were detained by the police because of the complaint of a store owner that they had been acting toward him essentially in an obstreperous manner. As one of the individuals was being accosted by the police, he was observed to transfer an object (clearly not a weapon) from one part of his person into the top of his boot. The object was seized, under a plain view rationale, and ultimately determined to be heroin. The conviction was reversed because there was no probable cause to believe that the object seized, although sighted in plain view, was indeed contraband. The Court held, at 282 So. 2d 704:

> "The reason for this rule is apparent. If the rule were otherwise, an officer, acting on mere groundless suspicion, could seize anything and

everything belonging to an individual which happened to be in plain view on the prospect that on further investigation some of it might prove to have been stolen or to be contraband. It would open the door to unreasonable confiscation of a person's property while a minute examination of it is made in an effort to find something criminal. Such a practice would amount to the 'general exploratory search from one object to another until something incriminating at last emerges' which was condemned in *Coolidge v. New Hampshire, supra.* Ex post facto justification of a seizure made on mere groundless suspicion, is totally contrary to the basic tenets of the Fourth Amendment.

. . . .

For an item in plain view to be validly seized, the officer must possess some judgment at the time that the object to be seized is contraband and that judgment must be grounded upon probable cause."

In *State v. Elkins*, 245 Or. 279, 422 P. 2d 250 (1966), an officer, as in the present case, seized pills which he did not know to be contraband but of which he was suspicious. The court there recognized that "before the officer had the right to seize the implements of a crime committed in his presence . . . he must have reasonable grounds to believe that the article he has discovered is contraband and therefore a crime is being committed." After a thorough review of the applicable search and seizure law, the Oregon Supreme Court reversed the conviction, concluding:

"The application of the above rules of law to the facts in the present case leaves only one result. The officer had no information from which it was reasonable to assume that the pills might be contraband. The conclusion to be drawn from the evidence was that the officer was acting on suspicion. It is not enough that the officer suspects in good faith, his suspicions must be reasonable. * * *"

In *United States v. Thomas*, 16 U.S.C.M.A. 306, 36 C.M.R. 462 (1966), the Court of Military Appeals reversed a conviction for possession of a bottle of narcotics. The authorities had relied upon a plain view seizure. The court held:

> "It is with the seizure of the bottle that we are here concerned, and not with any antecedent search. The Government urges that such was reasonable under the circumstances, but we must disagree. Whether a seizure is reasonable depends upon the existence of probable cause for that action. [citations omitted] There must be facts and circumstances from which the probability of the item's contraband nature may be inferred — 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [citations omitted] There is simply no basis shown on this record for any conclusion by Sergeant Lively that the seized bottle contained narcotics, or that accused was under its influence. * * *"

For cases of similar import see *Armour v. Totty*, 486 S.W.2d 537 (Tenn. 1972); *State v. Jackson*, 263 La. 849, 269 So. 2d 465 (1972); *United States v. Sokolow*, 450 F. 2d 324 (5th Cir: 1971); *Commonwealth v. Hawkins*, 280 N.E.2d 665 (Mass. 1972); *Jenkins v. State*, 46 Ala. App. 719, 248 So. 2d 758 (1971). The commentators are in unanimous support of the same principle. See Annotation, *Search and Seizure — Plain View*, 29 L.Ed.2d 1067; Comment, *Probable Cause to Seize and the Fourth Amendment: An Analysis*, 31 Albany L. Rev. 658 (1970); Kuipers, *Suspicious Objects, Probable Cause, and the Law of Search and Seizure*, 21 Drake L. Rev. 252 (1972); Comment, *Search and Seizure: Probable Cause for Seizure*, 7 Suffolk U.L.Rev. 184 (1972); and Rintamaki, *Plain View Searching*, 60 Military L. Rev. 25 (1973).

Even assuming a bona fide inventory and, therefore, a prior valid intrusion, it is clear that there was no probable cause to believe that the two pills here seized, albeit

inadvertently spotted in plain view, were contraband or other evidence of crime.

## IV

### *The Ostensible Inventory In This Case*

The more damning indictment of the search and seizure presently under review, however, is that we find, as a constitutional fact, that there was not a bona fide inventory.

Our duty to make an independent, reflective constitutional judgment is clear. As Judge (now Chief Judge) Orth said for this Court in *Gardner v. State,* 10 Md. App. 233, 245, 269 A. 2d 186:

> "[I]n determining whether the court made its decision within the required constitutional framework we must do so within the rule that '[w]hen constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record.' *Brookhart v. Janis,* 384 U. S. 1, note 4 at p. 4."

See also *Dillingham v. State,* 9 Md. App. 669, 710-715, 267 A. 2d 777 (concurring opinion by Orth, J.). When a constitutional issue is involved, such ostensibly factual questions as whether a confession is voluntary, whether a consent to search is freely given, whether there is probable cause, whether a lineup is impermissibly suggestive, whether a piece of literature is obscene, etc., are ultimate, conclusionary, second-level facts arising out of a series of more physical and concrete first-level facts. Such constitutional facts — or mixed questions of law and fact — are of necessity subject to independent appellate determination. *New York Times Co. v. Sullivan,* 376 U. S. 254, 285, 84 S. Ct. 710, 11 L.Ed.2d 686, 709 (1964); *Fiske v. Kansas,* 274 U. S. 380, 385, 47 S. Ct. 655, 71 L. Ed. 1108, 1110-1111; *Pennekamp v. Florida,* 328 U. S. 331, 335, 66 S. Ct. 1029, 90 L. Ed. 1295, 1297; *Stein v. New York,* 346 U. S. 156, 181-182, 73 S. Ct. 1077, 97 L. Ed. 1522, 1540; *Blackburn v.*

*Alabama,* 361 U. S. 199, 205, n. 5, 80 S. Ct. 274, 4 L.Ed.2d 242, 247 (1960); *Edwards v. S. Carolina,* 372 U. S. 229, 235, 83 S. Ct. 680, 9 L.Ed.2d 697, 702 (1963); *Haynes v. Washington,* 373 U. S. 503, 515-516, 83 S. Ct. 1336, 10 L.Ed.2d 513, 522 (1963); *Jacobellis v. Ohio,* 378 U. S. 184, 187-188, 84 S. Ct. 1676, 12 L.Ed.2d 793, 798-799 (1964); *Cox v. Louisiana,* 379 U. S. 536, 545, n. 8, 85 S. Ct. 453, 13 L.Ed.2d 471 (1965); *Bachellar v. Maryland,* 397 U. S. 564, 566, 90 S. Ct. 1312, 1313, 25 L.Ed.2d 570, 573 (1970). And see *Wagonheim v. Md. State Bd. of Censors,* 255 Md. 297, 306, 258 A. 2d 240; *Sanza v. Md. State Bd. of Censors,* 245 Md. 319, 330, 226 A. 2d 317; *Dennis v. Warden,* 6 Md. App. 295, 315, 251 A. 2d 909.

That the trial court found as a "fact" that there was a bona fide inventory does not preclude us from making our own independent judgment and it does not limit us to a "clearly erroneous" standard of review. As we said in *Walker v. State,* 12 Md. App. 684, 694-695, 280 A. 2d 260:

> "Where the resolution of a purely factual question is all that is involved, we, of necessity, give great weight to the finding of the hearing judge, and his decision will not be disturbed on appeal unless we find a clear abuse of discretion. [A constitutional decision,] however, be that decision made at a pretrial suppression hearing or while the jury is excused during the course of trial, is 'a mixed question of law and fact.' *Mulligan v. State,* 10 Md. App. 429, 431, n. 1; *Barnhart v. State,* 5 Md. App. 222, 224. It is, therefore, a situation 'where a conclusion of law as to a [constitutional] right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the [constitutional] question, to analyze the facts.' *Fiske v. Kansas, supra,* 385. We accord 'an appropriate and substantial effect to [the trial court's] resolutions of conflicts in evidence as to the occurrence or non-occurrence of factual events and happenings . . . But . . . We cannot be precluded . . . from determining whether the circumstances under

which the confession was made were such that its admission in evidence amounts to a denial of due process.' *Haynes v. Washington, supra,* 515, 516. What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact — the existence or non-existence of [in this case, a bona fide inventory]."

Indeed, in *Reagan v. State,* 4 Md. App. 590, 244 A. 2d 623, we engaged, of necessity, in constitutional fact-finding in a situation where the same issues were before us as face us now. The trial judge had there found "as a fact" that there had been a bona fide inventory search. Making our own independent, reflective constitutional judgment, we "found" otherwise, at 4 Md. App. 601:

"[The trial judge] found that the search was reasonable under *St. Clair v. State,* 1 Md. App. 605. We think the instant case is clearly distinguishable from *St. Clair,* where at the time the inventory was initiated, the police had no reason to suspect that the goods in the car did not belong to the arrestee and the sole purpose in removing the goods from the car was to inventory them in order to protect the presumed owner and the police from charge of loss. We recognized in our holding ' * * * the difficulty likely to be encountered in distinguishing a *bona fide* inventory from a mere subterfuge to search.' In the circumstances of the instant case, we

cannot say that the search of the appellant's car was a *bona fide* inventory and therefore reasonable under the holding in *St. Clair.*"

Taking then the first-level facts of "who, what, when and where" as found by the trial judge and making our own independent, reflective judgment as to what to make of those facts — that is, making *our own finding of the* ultimate, second-level, constitutional fact — we cannot help but conclude that the officer's resort to an inventory rationale was a case more of investigative opportunism than of genuine solicitude for personal property. The necessity for impounding the car was not remotely demonstrated.[3] The appellant's car, at the time of arrest, was on the parking lot of the Howard County Courthouse. It was still before noon on a working day. There was no apparent danger to the car or to its contents. The car, in turn, posed no irremediable danger to the flow of traffic. Either the appellant himself or one of the officers, within a few feet and within a few seconds, could have safely parked it, locked it and left it. The officer was asked why he called the tow truck. In view of the obvious and simple alternative of moving the car a few feet into a readily available parking space, the answer strikes us as disingenuous, "It was parked out here in the lane that runs through the Court House parking lot and was

---

3. A growing body of law is recognizing that a threshold prerequisite to any inventory search of an automobile is a lawful and reasonable impounding of the vehicle, or other exercise of custody over the vehicle, in the first instance. See Annotation, *Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police,* 48 A.L.R.3d 537, 544, 551-554, 577; *Virgil v. Superior Court of County of Placer,* 268 Cal. App. 2d 127, 73 Cal. Rptr. 793 (1968) (holding that an inventory search of a car impounded by the police after its driver had been arrested for reckless driving was unlawful, because police custody of the car was unjustified since no reason appeared why his friends, who were passengers in the car, could not have taken charge of the vehicle and pointing out that the officer did not consult the driver's wishes); *People v. Greenwood,* 484 P. 2d 1217 (Colo. 1971); *People v. Nagel,* 17 Cal.App.3d 492, 95 Cal. Rptr. 129 (1971) (invalidating an inventory search because police custody was neither necessary nor proper where the defendant had been arrested for running a red light and where there was no apparent reason why he could not have driven the vehicle to a nearby place for safekeeping); *United States v. Pannell,* 256 A. 2d 925 (D.C.App. 1969) (invalidating an inventory search because an impounding was unlawful where, after a driver was arrested for driving without a permit, there was no showing that a car, parked on a lot, was obstructing police operations).

obstructing traffic." It is simply not reasonable to tow a car away to avoid moving it to the curb.

There was no apparent reason why either the impounding or the inventorying was necessary in terms of protecting any personal property that might have been in the vehicle. The appellant himself could have been booked at the nearby stationhouse for the traffic violation and returned to his car well before the afternoon had waned. His sister, alternatively, could have been notified to come and pick it up. To have impounded the car and towed it away, under these circumstances, was a bizarre thing to do, explainable only as a subterfuge to search the car. We cannot credit the officer's representation that his sole purpose in searching the car before turning it over to the tow truck was to discover "valuable personal property, to keep for the defendant, so nothing would happen to it." As the officer acknowledged, easier alternatives were readily available and no explanation was offered as to why they might not have sufficed:

"Q. All right, so the answer is the keys were in your possession?

A. Yes, sir, they were.

Q. And it would have been very easily — easy for you to secure the vehicle by closing the windows and locking the doors, isn't that correct?

A. Yes, sir.

Q. Right. Also very easy for you, if you wanted to, you yourself to drive the car or have a tow truck pick it up, which you did?

A. Yes, sir, that's correct.

Q. And you could have secured the entire contents of the vehicle and its trunk by merely locking — securing the windows and locking the doors, and keeping the key in safe keeping, isn't that correct?

A. Yes, sir, it is."

The search of the locked trunk tended to belie the securing-of-property-against-loss theory:

"Q. Did you look into the trunk of the car?

A. I believe I did, yes, sir.

Q. Uh-huh. The trunk was locked?

A. The trunk was locked.

Q. Could you have gotten into that trunk without the key, without breaking it?

A. No, sir, I could not have.

Q. So whatever was in the trunk was also secured?

A. Yes, sir, it was."

Curiously, no inventory list was ever turned over to the appellant or produced in court. Apparently none was ever made. In terms of the officer's attentions, solicitude for personalty was easily cuckolded and lightly forgotten once the more attractive rival of the seizure of potentially incriminating evidence appeared in the field. In the light of such easy inconstancy of purpose, it is difficult to credit significantly the asserted initial commitment. As the officer acknowledged on cross-examination:

"Q. So you really didn't take it for his safekeeping? Correct? You took it as evidence, isn't that correct?

A. That's correct."

Our finding of the constitutional fact that this was not a bona fide inventory is, of course, fatal to the subsequent seizure. *Pigford v. United States*, 273 A. 2d 837 (D.C.App. 1971); *Reagan v. State, supra.* And see Annotation, *Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police*, 48 A.L.R.3d 537, at 544:

"An essential requirement to a valid inventory search is that the police must have acted in good faith in conducting the inventory, and must not have used the inventory procedure as a subterfuge for a warrantless search. It has therefore been held that where the conduct of the police was inconsistent with its contention that the search was conducted for inventory purposes, the search was unlawful."

The situation at bar bears an amazing parallel to that with which we dealt in *Kleinbart v. State,* 2 Md. App. 183, 234 A. 2d 288. There, as here, the defendant was initially stopped for a traffic violation. There, as here, he was driving his sister's car. There, as here, he was charged with driving "under the influence." There, as here, the car and its contents were towed away. There, as here, the car was searched "to protect the property." There, as here, the searching officer became suspicious about the property as he was checking it out. There, the property turned out to be stolen and the ultimate charge was grand larceny. The issue now before us was precisely the issue facing us in that case:

> "The next question before us is whether, under the facts shown in the record of this case, the removal by Trooper Arnold of the property within the car and the trunk for the avowed purpose 'to protect the property' constituted an unreasonable search and seizure in violation of the Fourth Amendment." *Id.,* at 2 Md. App. 194.

In holding that the search of the car and the seizure of its contents were unconstitutional, we there found it significant that the defendant had only been arrested for a traffic violation, for which he was entitled to an immediate hearing or to be released on bond. We found it significant that the vehicle was in the hands of a selected bailee in whom the police had confidence. We found it significant that the police had the keys with which to lock the car. We found it significant that the sister, who owned the car, was not notified to pick it up. We found it significant that the searching officer discontinued his inventory once he found something suspicious. The observations there made by the court, speaking through Judge O'Donnell, at 2 Md. App. 198-200, are remarkably appropriate here:

> "The facts upon which the court found in *St. Clair* that there was no 'unreasonable' search and seizure are clearly distinguishable, however, from the facts here in the record before us. Here, each of the Appellants was arrested for misdemeanors

committed in Trooper Blazejak's presence, on which charges they were entitled to an immediate hearing or to be released from custody on giving bond or collateral (see Art. 66$^{1/2}$, Sec. 320 Ann. Code, 1967 Repl. Vol.); the vehicle was towed for storage, to a designated, selected bailee in whose ability to protect the vehicle the police must have had confidence; the car doors would lock — in fact, Trooper Arnold used the keys to lock the vehicle after removing most of its contents; it was parked in a well-lighted area of the service station; no effort was apparently made to contact Mrs. Smallwood, its registered owner, who lived nearby at Landover, in the same county; there is no showing why, if the avowed purpose was to take 'protective custody' of the property, it was not removed contemporaneously with the transportation of the Appellants from the scene of the arrests to the Marlboro Post . . . Trooper Arnold searched not only the trunk of the vehicle. but the suitcase in it (a fact inconsistent with 'protective custody') and while in the process of removing articles from the vehicle before he transported them to Marlboro 'to be inventoried,' suspected that they had been stolen; nor did Trooper Arnold remove *all* the contents of the vehicle. Corporal Ansell was required to return to the vehicle that evening 'to finish cleaning it out.'
. . .

Upon the facts in the record before us, we cannot conclude that the removal of the property from the vehicle and the search of its trunk and the suitcase therein by Trooper Arnold was reasonable and not in violation of the guarantees of the Fourth Amendment."

In view of our disposition of the case on the search and seizure issue, it is unnecessary to deal with the two other contentions raised by the appellant.

*Judgments reversed.*