335 So.2d 916 (1975)
JOSEPH A. KINARD
v.
STATE.
1 Div. 576.
Court of Criminal Appeals of Alabama.
October 1, 1975.
Rehearing Denied October 28, 1975.
Thomas M. Haas, Mobile, for appellant.
*917 William J. Baxley, Atty. Gen., and Jane LeCroy Robbins, Asst. Atty. Gen., for the State.
HARRIS, Judge.
By agreement appellant was put to trial upon a "Solicitor's Complaint" which charged that he did unlawfully possess Marihuana for personal use.
Appellant demanded a trial by jury. The jury returned a verdict finding the defendant guilty of the unlawful possession of Marihuana for personal use as charged in the Solicitor's Complaint. The jury declined to assess a fine. The trial judge adjudged appellant guilty and sentenced him to imprisonment in the Mobile County Jail for six months.
Appellant made a pre-trial motion to suppress all the evidence taken from his person or his vehicle by law enforcement agents at or about the time of his arrest on the grounds that said evidence was illegally and improperly seized without a search warrant and without probable cause or legal excuse. A hearing on this motion was heard out of the presence and hearing of the jury.
The arresting officer, William Lundy, testified that he was employed by the Mobile Police Department on June 6, 1974, and had been so employed for about four years. Around 9:00 P.M., on that date, he was on Highway 90 around Azalea Road and stopped a van truck for an I.D. check, that he turned on his blue light and the van pulled over just east of Highway 90just east of 65 on Highway 90, eastbound.
From the record:
"Q All right, sir. Would you please tell the Court what happened after you stopped that van?
"A I turned my blue lights on and the van pulled over just east of Highway 90just east of 65 on Highway 90, eastbound. I got out of the car, Mr. Kinard got out of the driver's side of the van and started walking back towards me. We met between the van and the patrol car. I asked him for his identification and he showed me his driver's license. We walked around to the passenger's side and I opened the door on the passenger's side where Mathis was sitting in the driver's seat and Patsy Brunson was sitting on the cooler between the two seats right by the console.
"Q Was there a person that you later learned to be R. L. Dean in the back of the van?
"A Yes, sir; he was laying down in the back of the van.
"Q All right. When you referred to `Mathis,' are you referring to James Matthews?
"A Right. James Matthews.
"Q All right. Now, please continue.
"A I shined my light in the van in front of James Matthews and the ash tray was open withthere was a cellophane bag with some small pills.
At this time, I got all of the subjects out of the van that were in the van, James Matthews, Patsy Brunson and R. L. Dean out of the back of the van. I asked them for their identification as they were standing beside the van. Each one of them gave me some form of identification.
At that time, my backup had arrived and we placed them in the back seat of my scout car. Then, we walked back up to the van, which my backup was Officer Robbins, and we got the cellophane bag out of the ash tray. Then, we reached up under the dash and got the rest of the stuff out.
"Q Tell the Judge what the rest of it was, if you remember.
"A To the best of my knowledge, it was a couple of prescription bottles with some pills in it and some more cellophane bags with other pills and some marijuana.
"Q What did you do then, if anything?
"A At that time we called for a C.I.D. Unit and a Sergeant had arrived.
"Q All right.
"A My Supervisor."
*918 On cross-examination he testified that he did not have an arrest warrant for anyone in the van and did not have a search warrant to search the van. He further stated that he did not stop the van because of any particular driving violation.
On re-direct examination he said he stopped the van to make an I.D. check and this was a normal function of his police duties from time to time. He further testified that when the driver of the van showed him his driver's license, he asked him who owned the van and he said he was the owner.
The court denied appellant's motion to suppress and the jury was brought back to the court room and the trial in chief got under way.
Officer Lundy testified to essentially the same facts before the jury as he gave on the motion to suppress as to stopping the van and the occupants thereof. In addition, he testified that it was a 1969 Ford van, tan in color, and had some type of build-up on the roof of it, and it stood out from other vans. That when he shined the light inside the van, he saw the ash tray was open and saw a cellophane bag in plain view with some small pink pills in it. He further stated that when the three men and woman were put in his scout car, that he told them they were under arrest. He said that the other contraband was up under the dash of the air conditioner duct. Aside from the pills he described the other material as follows:
"There was some ground leafy type material was in one bag and there was a partially smoked whatit looked like sort of a cigarette with some other ground leafy material with some seeds of some sort in it."
He further testified they turned over to Sergeant Moore at the scene everything they removed from the van; that he took the four occupants of the van downtown, to the Detective Division of the Mobile Police Department. The van was towed to an uptown garage.
Police Officer Robert Moore testified that he worked in the Criminal Investigation Division of the Mobile Police Department and had been so employed for twelve years, that on the night of May 6, 1974, he was on routine patrol and received a call by radio to meet Officer Lundy. When he arrived at the scene, Lundy told him what he had and showed him the pills he had found and how he had found them. Moore told Lundy they had probable cause to search the rest of the van. He said, "I was standing right behind Officer Lundy and Officer Robbin when they took assortment of pills and green plant material from underneath the dash in the air conditioner fan." He said he had a conversation with the defendant in which the defendant admitted ownership of the van.
Moore further testified that he took everything that was removed from the van and carried it to Police Headquarters and turned it over to Officer Ronnie Meiers the next day. He stated that he advised each of the four occupants of the van of their rights individually. Moore said it was standard procedure when booking people who were under arrest to have them empty their pockets; that appellant had a wallet, keys, and there was $192.00 in his wallet.
All of the above testimony was strenuously objected to by appellant's counsel. The objections were overruled.
Dr. Nelson E. Grubbs, Assistant State Toxicologist in charge of the Mobile laboratory, was called as a witness for the state. At this point it was made known to the court that a stipulation had been entered into between the prosecutor and defense counsel that if Police Officer Ronnie Meiers was present, he would testify that Officer Moore gave him everything that was found and removed from the van and he delivered them to the toxicologist, Dr. Nelson Grubbs.
From the record:
"THE COURT: Members of the jury, what a stipulation is, of course, would be an area where both sides of the case would say, we agree that these facts are part of the facts to be submitted to the *919 jury, so you don't have to worry about them. In other words, it is more or less stipulating as to certain evidence for you to receive and accept as a part of the evidence in this case. And what Mr. Haas said and what Mr. Valeska said about the stipulation would be for you to accept as evidence in the case in determiningin making your decision. All right, go ahead."
The qualifications of the toxicologist were admitted by defense counsel and he testified that he received a package from Officer Meiers. He identified state's Exhibit Number 1 as a plastic brown vial with a green top on it containing nine grams of Marihuana seeds and some packing material on top of it. He identified state's Exhibit Number 2 as a plastic bag containing ground leaf material of Marihuana and ground seeds of Marihuana, and state's Exhibit Number 3 containing the flowering top of Marihuana and a cigarette butt, commonly called a roach. These exhibits were introduced in evidence over objections of defense counsel that the proper predicate had not been laid, the proper identification had not been made, and the evidence was seized illegally by the officer. These objections were overruled as the toxicologist had testified that these exhibits had been in his exclusive possession since he received them and were not available to anyone else except Mrs. Pillman an employee of the laboratory who worked directly under his supervision.
Mrs. Alilee Pillman was called as a witness for the state and testified that she was employed by the State Department of Toxicology and Criminal Investigation in Mobile County. Defense counsel also admitted her qualifications.
This witness was shown state's Exhibits 4, 5 and 6. She stated she received them from Officer Meier on May 7, 1974. She stated she made an examination and analysis of the contents of these exhibits and found Exhibit Number 4 contained gleanings of Marihuana. That Number 5 contained tablets of butysol sodium, a derivative of barbituric acid, and that Exhibit Number 6 contained lysergic acid, diethylamide, and phencyclidine. That the common names for these drugs are LSD and PCP. These exhibits were received in evidence over heated objections of appellant.
Sergeant Robert Moore was recalled and testified that all of the above drugs were removed from the van at the scene where Officer Lundy had stopped it. He further testified that appellant was re-advised of his rights at Police Headquarters and told the officer that he understood his rights and that the van belonged to him. Appellant signed a waiver of rights form.
The state rested and appellant made the following motions outside the presence of the jury.
"MR. HAAS: If it please the Court, the Defendant, the State having rested in the trial in this case, moves the Court to exclude the evidence presented in the case on the following grounds separately and severally: One, the State has failed to sustain its burden of proof; two, the State has failed to establish a prima facie case; three, there is a variance between the charge and the evidence that is presented and a variance between the evidence itself as to dates, times, and places; and I renew the motion to suppress the evidence as beingas having been illegally obtained. I further respectfully point out to the Court that this is a misdemeanor, a marijuana indictment. There is another charge pending in this Court against this Defendant which covers Exhibits # 4 and # 6 which have been introduced in this case and this is an overlap. It is in 31,662 in this Court in which this Defendant is charged with possession of various pills including LSD and barbiturics, and on all of those grounds separately and severally I move to exclude it.
"THE COURT: Any response from the State.
"MR. VALESKA: No response, Your Honor.
"THE COURT: I will deny the motions.
"MR. HAAS: We would respectfully except, and I renew my motion for a mistrial *920 on the grounds that they are trying this Defendant on a misdemeanor, a District Attorney's complaint charging possession of marijuana for personal use, and they are bringing in to evidence, evidence of felonies that are involved in other cases in this Court, as I have pointed out to Your Honor. It is pending on Judge Hodnette's docket.
"THE COURT: Overruled."
The lack of daylight requiring the use of a flashlight to view from the outside the contents of the van truck, does not constitute a search and make the plain view doctrine inapplicable in this case. Parks v. State, 46 Ala.App. 722, 248 So.2d 761; Sheridan v. State, 43 Ala.App. 239, 187 So.2d 294.
Possession is not limited to actual manual control upon or about the person, if under one's power and dominion the thing is possessed. That the appellant had knowledge of the presence of the drugs can reasonably be inferred from his possession, control and ownership of the van. Lawson v. State, 38 Ala.App. 322, 82 So.2d 812; Seawright v. State, 52 Ala.App. 286, 291 So.2d 376.
Title 36, Section 59, Code of Alabama, provides that "every person, except those hereinbelow exempted, before driving any motor vehicle upon a public highway in this state, shall procure a driver's license."
Title 36, Section 65, Code of Alabama 1940, provides:
"Possession and display of license.Every licensee shall have his license in his immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a justice of the peace, recorder, a peace officer, or an officer or patrolman of the state highway patrol. However, no person charged with violating this section shall be convicted if he produces in court or the office of the arresting officer a driver's license theretofore issued to him and valid at the time of his arrest."
The above quoted section confers upon every law enforcement officer of the state express authority to stop a motorist on a public highway for a "routine spot check" of his driver's license. To hold otherwise would do violence to the very language of this statute.
In Daniels v. State, 290 Ala. 316, 276 So.2d 441, Mr. Justice Bloodworth, writing for a unanimous court, said:
"Since the officers conducted a `warrantless' search, it cannot, of course, be upheld as valid unless it falls within one of the exceptions to the rule that a search must be conducted pursuant to a valid search warrant.
Notwithstanding the United States Supreme Court's assertion that its cases on the subject of the extent of a search which may be made without a warrant following a lawful arrest `cannot be satisfactorily reconciled,' it now seems to be fairly well established that there are at least six exceptions under which warrantless searches have been held valid, viz:
(1) In `plain view,' see Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971);
(2) With `consent' voluntarily, intelligently and knowingly given, see Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938);
(3) As `incident to a lawful arrest,' see Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959);
(4) In `hot pursuit' or `emergency' situations, see Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947); State v. Sutton, (Mo.1970) 454 S.W.2d 481;
(5) Where `exigent circumstances' exist coincidental with `probable cause' (as in the case of movables), see Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); and,

*921 (6) In `stop and frisk' situations, see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889 (1968)."
Two of the noted exceptions, (1) and (5), are applicable to the instant case. The officer shined his flashlight into the van and saw a cellophane bag with pink pills in the open ash tray. This was in "plain view." Because the van was movable "exigent circumstances" coupled with probable cause that other drugs might be found in the van afforded the officers probable cause to conduct a full search of the van on the highway.
Since appellant was tried for possession of Marihuana for personal use only, a misdemeanor under the controlling statute, we think it was manifestly unfair and highly prejudicial to his case for the trial court to allow in evidence the "hard drugs" found in a search of the van and we would reverse and remand the case for a new trial. However, we are bound by the decisions of our Supreme Court. The opinion of the Supreme Court in Ex parte: State of Alabama Ex Rel. Attorney General (In Re: Brantly v. State of Alabama), 294 Ala. 344, 317 So.2d 345, released on January 9, 1975, concludes and stays our hand.
We find no reversible error in the record and the case is affirmed.
Affirmed.
TYSON and DeCARLO, JJ., concur.
CATES, P. J. and BOOKOUT, J., dissent.
BOOKOUT, Judge (dissenting).
I respectfully dissent from the conclusion expressed by Judge Harris in this opinion.
The testimony, set out in the majority opinion, shows that the police officer got out of his patrol car and the driver of the van got out and started walking back toward him. The officer asked him for his identification and he showed the officer his driver's license. The officer walked around to the passenger's side and opened the door. He observed the occupants of the van and then shined his flashlight in front of Matthews, on the ash tray which was open, and saw a cellophane bag containing some small pills.
On cross-examination the officer testified that he did not have an arrest warrant for anyone in the van and did not have a search warrant. He stated that he did not stop the van because of any particular driving violation.

I

THE INITIAL STOPPING
I believe the officer had a legal right to inspect the driver's license of the driver of the van pursuant to Title 36, Section 59, Code of Alabama 1940, although the recent Border Patrol decisions of the U. S. Supreme Court, infra, cast doubt upon even that.
As pointed out in the majority opinion, for a warrantless search to be valid it must fall within one of the enumerated exceptions spelled out in Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973). The majority opinion is based upon the "plain view" exception and the exception of "exigent circumstances" existing coincidental with "probable cause." I do not find that any of those exceptions existed in the instant search.

II

THE SEARCH
It is my opinion that everything the police officer did was legal up to the point where he went to the passenger's side of the van and opened the door. Assuming he had the legal right to stop the van without probable cause to believe a violation of the law was taking place or had taken place, he could only perform that duty he was legally entitled to perform, i. e. check the driver's license. When he opened the door on the passenger's side, an illegal search commenced as he clearly had no probable cause to believe a violation of the law had taken place or was taking place. The officer's own testimony establishes that he had no *922 reason to stop the van except for a "routine I.D. check," which we take to mean a driver's license check.
In the first of the recent Border Patrol cases, the U. S. Supreme Court held that the Fourth Amendment does not allow a roving patrol to conduct warrantless searches of automobiles without probable cause or consent, away from the border or its functional equivalent. Almeida-Sanchez v. U. S., 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). In that case, the appellant had been stopped by a roving patrol of the U. S. Border Patrol some 25 air miles away from the Mexican border, and a large amount of marijuana was discovered in his auto. There was no search warrant and no evidence that probable cause of any kind existed for the stop or subsequent search. The Court found that not even "reasonable suspicion" existed (which is sufficient in "stop and frisk" cases), and went on to state:
"It is settled, of course, that a stop and search of a moving automobile can be made without a warrant. That narrow exception to the warrant requirement was first established in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. . . . Carroll has been followed in a line of subsequent cases, but the Carroll doctrine does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search."
The Court in Almeida-Sanchez held that the marijuana discovered in appellant's car should not have been used in evidence against him and reversed his conviction. The Court recognized there the magnitude of the illegal alien problem encountered by the government, just as former Chief Justice Taft had done earlier with the Prohibition Law enforcement in Carroll v. United States, supra. However, in both instances the Fourth Amendment rights prevailed in what the Court termed the "constant tension" between the needs of law enforcement versus constitutional protection of the individual from certain excesses of official power.
On June 30, 1975, the U. S. Supreme Court released two additional opinions of considerable consequence on this subject. In U. S. v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) the Court expanded Almeida-Sanchez, to prohibit roving patrols of the U. S. Border Patrol from merely stopping and questioning occupants about their citizenship in areas other than at the border or its functional equivalent, where the only ground for suspicion is the occupants' apparent Mexican ancestry.
In U. S. v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), the Court further held the Border Patrol could not maintain a checkpoint away from the border where automobiles were stopped and searched, in the absence of consent or probable cause.
The Court, in these cases, draws a distinction between probable cause to search and the less stringent rule of "reasonable suspicion" to merely stop a vehicle without conducting a search.
In Brignoni-Ponce, supra, "two officers were observing northbound traffic from a patrol car parked at the side of the highway. The road was dark, and they were using the patrol car's headlights to illuminate passing cars. They pursued respondent's car and stopped it, saying later that their only reason for doing so was that its three occupants appeared to be of Mexican descent. The officers questioned respondent and his two passengers about their citizenship and learned that the passengers were aliens who had entered the country illegally."
Again after recognizing the enormity of the illegal alien problem, the Court held steadfast to the principle that such a warrantless search of an automobile must be based upon consent or probable cause. The Court did not prohibit all stopping of vehicles for the purpose of inquiring as to the nationality of the occupants. It did prohibit "stopping vehicles at random . . . *923 or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." Such stops may only occur if officers, ". . . are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." The Court then set out a number of factors which officers may take into consideration in deciding whether "reasonable suspicion" exists for initially stopping a vehicle, which inter alia includes the behavior of the driver, such as erratic driving or an obvious attempt to evade officers.
The Court concluded by finding that the officers in that case relied only on the factor that the appellant was of apparent Mexican ancestry which was insufficient to raise a reasonable suspicion to stop the car.
Thus, Brignoni-Ponce, supra, casts considerable doubt upon random driver's license checks by police, however it is unnecessary to decide on such an issue in the instant case. Assuming the initial stopping of the van was legal, my objection goes to the subsequent search, which was not conducted with consent or probable cause.
In the Ortiz case, supra, where the warrantless search of the appellant's auto produced three illegal aliens hiding in the trunk, the U. S. Supreme Court stated: "A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search." In that case the evidence did not show any special reasons for the officers to believe the vehicle contained aliens and the conviction did not stand.
In the instant case the arresting officer states without contradiction that he was conducting a "routine I.D. check" and had no reason to believe there was any violation of the law when he stopped the van. The evidence fails to establish that any additional facts came to the officer's attention to give him probable cause between the time he stopped the van and the time when he opened the door of the van and began his search. The search was clearly without probable cause and therefore illegal.

III

THE PILLS AND THE PLAIN VIEW DOCTRINE
Another question arises of whether an officer seeing pills in plain view, without knowing what they are, may make an arrest and a more detailed search of an automobile. Our Supreme Court answers this question in the negative in the case of Shipman v. State, 291 Ala. 484, 282 So.2d 700 (1973).
Justice James N. Bloodworth, a nationally recognized expert on the subject of search and seizure, wrote the majority opinion in that case. In Shipman, an officer who was justified in stopping a vehicle to ask for an explanation regarding certain conduct, about which he had received a complaint, witnessed an occupant shift some cellophane packages from one hand to another and conceal them in his boot top. Whereupon the officer seized the packages, which ultimately were determined to contain heroin. The Alabama Supreme Court reversed, stating:
"For an item in plain view to be validly seized, the officer must possess some judgment at the time that the object to be seized is contraband and that judgment must be grounded upon probable cause."
* * * * * *
"It is well settled that one cannot make a search legal by what it turns up. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Dennis v. State, 40 Ala.App. 182, 111 So.2d 21 (1959). Furthermore, it has been held that for plain view to justify a warrantless seizure, the incriminating character of the object must be apparent."
*924 The Supreme Court, in further explanation held, at page 488, 282 So.2d at page 704:
"The reason for this rule is apparent. If the rule were otherwise, an officer, acting on mere groundless suspicion, could seize anything and everything belonging to an individual which happened to be in plain view on the prospect that on further investigation some of it might prove to have been stolen or to be contraband. It would open the door to unreasonable confiscation of a person's property while a minute examination of it is made in an effort to find something criminal. Such a practice would amount to the `general exploratory search from one object to another until something incriminating at last emerges' which was condemned in Coolidge v. New Hampshire, supra. Ex post facto justification of a seizure made on mere groundless suspicion, is totally contrary to the basic tenets of the Fourth Amendment.
More importantly, the officer, if he were so justified in seizing items upon mere suspicion, could then hold the accused, as was done here, until the next day when the results of the toxicologist's report was forwarded. Such would clearly contravene the Fourth Amendment."
Justice Bloodworth's opinion is cited and quoted in pertinent part in support of a similar holding by the Court of Special Appeals of Maryland in Dixon v. State, 23 Md.App. 19, 327 A.2d 516 (1974). In Dixon, the police officer, in attempting to make an "inventory search" of the defendant's auto in the courthouse parking lot, looked into the back seat and observed two pills in plain view. He took the pills and had them tested and they were determined to be illegal barbiturates. The Maryland Court in reversing the conviction, stated inter alia:
"Even assuming a bona fide inventory and, therefore, a prior valid intrusion, it is clear that there was no probable cause to believe that the two pills here seized, albeit inadvertently spotted in plain view, were contraband or other evidence of crime."
For cases of similar import see Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); State v. Elkins, 245 Or. 279, 422 P.2d 250 (1966); and United States v. Thomas, 16 U.S.C.M.A. 306, 36 C.M.R. 462 (1966).
The seizure of the pills from the ash tray in the van in the instant case, and the resulting detailed search it occasioned, clearly do not meet the test set down by our Supreme Court. For the foregoing reasons the motion to suppress should have been granted.